**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIIA**
**Richmond Division**

**CAROLYN MAE SAMS,**

   **Plaintiff,**

**v.**                **Civil Action No. 3:19cv639**

**ARMOR CORRECTIONAL HEALTH**
**SERVICES, INC.,** *et al.***,**

   **Defendants.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on six motions:

(1) Defendant Armor Correctional Health Services Incorporated's ("Armor") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)[1] (the "Armor Motion to Dismiss"), (ECF No. 11);

(2) Defendants Tasheiba L. Cumbo, Brittany B. Harris, Cheryl A. Kelske's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Armor Individual Defendants Motion to Dismiss"), (ECF No. 15);

(3) Defendant Pamunkey Regional Jail Authority's ("PRJA") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "PRJA Motion to Dismiss"), (ECF No. 20);

(4) Defendants Tyonna S. Key, S. Robinson, N. Stith, K. Turner's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "PRJA Individual Defendants Motion to Dismiss"), (ECF No. 22);

(5) PRJA's Motion to Certify Question of State Law to the Supreme Court of Virginia (the "PRJA Motion to Certify"), (ECF No. 29);

(6) Defendant Maria M. Murrell's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Murrell Motion to Dismiss"), (ECF No. 41).

---

[1] Rule 12(b)(6) allows dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Plaintiff Carolyn Mae Sams responded in opposition to the Armor Motion to Dismiss, (ECF No. 19), the Armor Individual Defendants Motion to Dismiss, (ECF No. 27), the PRJA Motion to Dismiss and the PRJA Individual Defendants Motion to Dismiss, (ECF No. 32), the Motion to Certify, (ECF No. 37), and the Murrell Motion to Dismiss, (ECF No. 43).  Defendants replied, (ECF Nos. 26, 31, 38, 39, 44.)

The matter is ripe for disposition.  The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331[2] and 28 U.S.C. 1367(a).[3]  For the reasons that follow, the Court will grant the Murrell Motion to Dismiss, (ECF No. 41), grant in part and deny in part the Armor Individual Defendants Motion to Dismiss and the PRJA Individual Defendants Motion to Dismiss (ECF Nos. 15, 22), and deny the Armor Motion to Dismiss, the PRJA Motion to Dismiss, and the PRJA Motion to Certify, (ECF Nos. 11, 20, 29.)

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Sams asserts that "jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343.  Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§ 1367 (a), over the state law claims."  (Compl. ¶ 13.)

[3] The Court exercises supplemental jurisdiction over Sams's Virginia and common law claims pursuant to 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").  Sams alleges claims of negligence and gross negligence under Virginia law.

2

### I.  Factual and Procedural Background

This negligence, gross negligence, and 42 U.S.C § 1983[4] action arises out of Defendants alleged failure to provide Plaintiff Carolyn Mae Sams with requested and necessary medical treatment while she was detained by the PRJA.  Sams alleges that as a result of Defendants' failure, she suffered stroke, acute brain failure, and severe sepsis due to untreated endocarditis.

### B.   Factual Background[5]

On September 15, 2018, then 37-year-old Sams "suffered a stroke while being detained at [PRJA]."  (Compl. ¶ 1, ECF No. 1.)  "Emergency Department physicians who treated Ms. Sams observed that she suffered acute brain damage due to 'failed' treatment for severe sepsis due to endocarditis."  (*Id.*)  Sams alleges that in the days preceding her stroke "on at least *six* documented occasions" she "sought medical help from Defendants."  (*Id.* ¶ 2.)  Despite these repeated requests, Defendants "disregarded" Sams's "serious medical condition."  (*Id.*)

---

[4] Title 42, Section 1983 of the United States Code states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress , . . . injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

[5] For the purpose of the Rule 12(b)(6) Motion to Dismiss, the Court will accept the well-pleaded factual allegations in Sams's Complaint as true, and draw all reasonable inferences in favor of Sams.  *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) ("[A] court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

### 1.   The Defendants

The Court first offers an overview of the ten defendants in this action:  Armor, Harris, Kelske, Cumbo, Murrell, PRJA, Robinson, Turner, Key, and Stith.

### a.   Defendant Armor Correctional Health Services Inc.

Armor "is a corporation organized under the laws of the State of Florida with its principal office in Miami, Florida, and with operations in Virginia."  (Compl. ¶ 17.)  "At relevant times hereto, beginning with . . . Sams's detention at [PRJA] in August 2018 and continuing through . . . Sam[s]'s stroke in September 2018, Armor had a contract with [PRJA]."  (*Id.*)  Pursuant to that contract, Armor "'under the supervision of the [Regional] Jail's Director of Medical Services,' assumed responsibility for the provision of on-site medical services to all inmates/detainees at [PRJA], including . . . Sams."  (*Id.*)  For inmates who require attention outside of the Regional Jail,[6] the Medical Division "'also coordinates with local hospitals and medical providers for inmates to be seen.'"  (*Id.*)  "Armor and its employees/agents, at all relevant times, provided services to [PRJA] as an independent contractor."  (*Id.*)

### b.   Defendant Harris, ARNP

Harris "is an advanced registered nurse practitioner ('ARNP'), who, at all relevant times, was working at the Regional Jail."  (Compl. ¶ 18.)  "At all relevant times, Harris . . . was an employee and/or agent of Armor acting within the scope of her employment and/or agency, and under color of state law."  (*Id.*)  Nurse Practioner Harris's job description includes the following tasks:

- Performs medical examinations and evaluations, diagnoses, treatment, follow-up consultation and health education.
- Manages patient's overall care

---

[6] The Court will refer to Pamunkey Regional Jail as either "PRJA" or as Sams does in the Complaint as the "Regional Jail."

- Obtains patient histories and develops patient care treatment plans…
- Supervises and/or coordinates the activities of patient care and/or support staff.
- Diagnoses and treats acute and chronic conditions.
- Prescribes medications and other treatments.
- Participates in planning programs and in developing specific health policies and procedures.

(*Id.*) Harris "is sued in her individual capacity." (*Id.*)

### c.   <u>Defendant Kelske, EMT-B</u>

Kelske "is an emergency medical technician [EMT], who, at all relevant times, was working at the Regional Jail." (Compl. ¶ 19.) "At all relevant times, Kelske . . . was an employee and/or agent of Armor acting within the scope of her employment and/or agency, and under color of state law." (*Id.*) EMT Kelske's Armor job description reflects that her "'Essential Functions'" are: "'[p]erforms initial assessment and management of illness or injury . . . and '[p]rovides direct paramedical and comprehensive patient care, as required in each individual case.'" (*Id.*) Kelske, like Harris, "is sued in her individual capacity." (*Id.*)

### d.   <u>Defendants Cumbo & Murrell, LPNs</u>

Nurses Cumbo and Murrell "were, at all relevant times, licensed practical nurses [LPNs] working at the Regional Jail." (Compl. ¶ 20.) "At all relevant times . . . Cumbo . . . and Murrell . . . were employees and/or agents of Armor acting within the scope of their employment and/or agency, and under color of state law." (*Id.*) Cumbo and Murrell's Armor job descriptions include the following tasks:

- Assists health care providers, registered nurses . . . with examinations, treatments, special tests and routine procedures
- Obtains patient health history, . . . vital signs . . .
- Ensures patient is receiving proper care for injury or condition.
- Reviews patient chart; records and reports observed symptoms, reactions, treatments, and changes in patient's conditions.

(*Id.*) Both Cumbo and Murrell "are sued in their individual capacities." (*Id.*) Sams asserts that in accordance with Virginia law, LPNs such as Nurses Cumbo and Murrell are

> not permitted in Virginia to independently assess patients or render a nursing diagnosis or nursing opinion of a patient's symptoms and potential problems a patient may face. LPNs must always act under the supervision and direction of a registered nurse (RN) (who can make such an assessment) or a physician/nurse practitioner (who has a wider scope of practice and can actually medically diagnose as well). *See* 18 [Va. Admin. Code] 90-19-70. Supervision of Licensed Practical Nurses. "Licensed practical nursing shall be performed under the direction or supervision of a licensed medical practitioner, a registered nurse, or a licensed dentist." However, the records indicate that LPNs saw . . . Sams alone.

(Compl. 13 n.3.)

### e. **Defendant PRJA**

PRJA "is a jail authority created by Hanover County, Caroline County, and the Town of Ashland, Virginia pursuant to Va. Code §§ 53.1-95.2 *et seq.*[7] to manage the Pamunkey Regional Jail." (Compl. ¶ 22.) The Regional Jail, located in Hanover County, Virginia, contains 519 beds. (*Id.*) A Hanover County website for the PRJA states that PRJA "'is administered and operated by an independent governmental body called the Pamunkey Regional Jail Authority, which is authorized according to the Virginia Code' and that '[t]he Pamunkey Regional Jail Authority directs the growth, operation, and business activities of the jail and has served the local incarceration needs of its member localities of Hanover County, Caroline County and the Town of Ashland since 1998.'" (*Id.*)

---

[7] Va. Code § 53.1-95.2 states that "[t]he governing bodies of two or more counties, cities, or towns or a combination thereof may by concurrent ordinances or resolutions or by agreement, create a jail authority. Such authority shall be subject to all rights, privileges, and obligations contained in Chapter 3 (§ 53.1-68 et seq.) of this title." VA. CODE ANN. § 53.1-95.2. In turn, Va. Code § 53.1-95.7 lays out the powers and nature of regional jail authorities, stating that "[e]ach authority created hereunder shall be deemed to be an instrumentality exercising public and essential governmental functions to provide for the public safety and welfare, and each such authority is hereby authorized and empowered [to exercise thirteen powers]." VA. CODE ANN § 53.1-95.7.

"At all times while . . .  Sams was in custody at the Regional Jail, the [PRJA] had the duty to provide adequate care to . . . Sams." (*Id.* ¶ 22(h).)  Specifically, the PRJA "was required to comply with Section 53.1-126 of the Code of Virginia, which states that, with regard to detainees/inmates, '. . . medical treatment shall not be withheld for any . . . serious medical needs, or life threatening conditions.'" (*Id.*)  Under Va. Code § 53.1-95.7, the PRJA is empowered to "'[t]o appoint, select, and employ officers, agents, and employees … and to fix their respective compensations[.]"[8] (*Id.* ¶ 22(g).)  The PRJA employs Defendant Correctional Officers S. Robinson, K. Turner, Tyonna S. Key, and N. Stith.  (*Id.*)

### f.      Defendant Correctional Officers Robinson & Turner

The PRJA employs S. Robinson and K. Turner as correctional officers.  (Compl. ¶ 23.)  As correctional officers, Robins and Turner are "responsible for maintaining the custody and care" of detainees and inmates at the Regional Jail.  (*Id.*)  According to their PRJA job descriptions, correctional officers "'perform[] routine duties to provide the safety and security of incarcerated inmates . . .'" (*Id.* ¶ 25.)  The "'Essential Functions'" of the correctional officer position includes "'[c]ontrol and monitor housing areas . . . monitor inmate behavior and activity . . . . [r]espond to emergency situations or codes in order to establish control and safety of co-workers and inmates.'" (*Id.*)

---

[8] In the Complaint, Sams makes several assertions about the statutory powers and status of the PRJA, which amount to legal conclusions.  For instance, Sams states that "[t]he Regional Jail Authority is not an arm or agency of the Commonwealth of Virginia" and that "[p]resently, and at all relevant times hereto, the Regional Jail Authority lacked the power of eminent domain." (Compl. ¶ 22.)  As discussed in more depth in denying the PRJA Motion to Dismiss, the Court need not weigh these assertions for their factual or legal truth as the Parties agree on the essential powers of the PRJA under Virginia law.

Robinson and Turner "were specifically assigned to, among other units, the Regional Jail's H Unit on the night shift for September 14, 2018." (*Id.* ¶ 23.)  Both Robinson and Turner "are sued in their individual capacities." (*Id.*)

### g.      Defendant Correctional Officers Key and Stith

The PRJA employs Tyonna S. Key and N. Stith as correctional officers. (Compl. ¶ 24.) As correctional officers, Key and Stith are "responsible for maintaining the custody and care" of detainees and inmates at the Regional Jail. (*Id.*)  "Defendants Key and Stith were specifically assigned to, among other units, the Regional Jail's H Unit on the morning of September 15, 2018." (*Id.*)  Both Key and Stith "are sued in their individual capacities." (*Id.*)

### 2.      Sams's Allegations Relating to Her Medical Care at PRJA

On August 23, 2018, Sams was arrested and booked at the Regional Jail. (Compl. ¶ 26.) That same day, Sams underwent three health screenings at PRJA. (*Id.*)  The "Patient Intake Health Screening" found "'[n]o significant condition.'" (*Id.* ¶ 27(a).)  Sams was "'instructed to access health services as needed.'" (*Id.*)  The Mental Health Intake Screening "found '[n]o active mental health symptoms; general population, follow-up as needed.'" (*Id.* ¶ 27(b).) Finally, the Nursing Health Assessment of Sams found "[n]o significant health conditions identified at present." (*Id.* ¶ 27(c).)

### a.      Sams's First Request for Medical Assistance

Nearly three weeks into pretrial confinement, on September 11, 2018, at about 8:38 a.m., Sams "made a Medical Sick Call Request through the Regional Jail's Offender Management System [OMS], an electronic communications system, indicating that she had been suffering

8

from 'three days of headache' and imploring, 'so sick please help.'"[9]  (Compl. ¶ 28.)  At 2:15

p.m., roughly five and a half hours after Sams made her request, a non-defendant Armor nurse

wrote in the medical record:  "'seen today 9/11/2018.'"  (*Id.* ¶ 29.)  Sams's Medical Sick Call

Request was marked, "'Closed.'"  (*Id.*)  Besides a blood pressure reading by another nurse, there

"is no medical chart note describing . . . Sams's presentation/complaints, or any examination

performed, or plan of care made."  (*Id.*)  The medical record shows that Nurse Practitioner Harris

entered "a verbal order" for "Tylenol 500 mg. and Zofran (nausea and vomiting medication) 4

mg. stat . . . [b]ut there is no record indicating that Harris examined . . . Sams."  (*Id.*)

### b.  Sams's Second Request for Medical Assistance

The next day, on September 12, 2018, at about 12:52 a.m., Sams "informed an officer

that she was suffering from a migraine headache."  (Compl. ¶ 30.)  Although the officer called

Medical, who "would have been aware of . . . Sams's previous headache and illness complaints

in the electronic medical record," Medical told the officer "that . . . Sams 'would receive meds in

the morning.'"  (*Id.* ¶ 31.)

### c.  Sams's Third Request for Medical Assistance

On September 12, 2018, at about 10:44 a.m., ten hours after her second request for

medical assistance, Sams "made another Medical Sick Call [R]equest through [OMS]." (Compl.

¶ 32.)  Sams wrote:

> **My headache isnstill really bad n I still feel sick n cant eat . . . im still really
> bad n know im running a fever . . . get cold than burning up..whole face swallon
> n hurts, I feel like my ears are going to explode, please help asap,** Tylenol helps
> some but **im hurting soo bad**

---

[9] The Court quotes the Plaintiff's Complaint verbatim without changing typographical
errors, punctuation, boldface, or other emphasis.  Any such emphasis is in the Complaint.

(*Id.*)  In response, at 11:52 a.m., Defendant Kelske wrote "you are on Tylenol.  We do not dispense any other pain medication." (*Id.* ¶ 33.)  EMT Kelske did not respond to or otherwise acknowledge Sams's expressed symptoms or distress and marked Sams's Medical Sick Call Request "'**Closed**.'" (*Id.*)

###   d.     Sams's Fourth Request for Medical Assistance

On September 12, 2018, at about 2:48 p.m., four hours after Sams's third request for medical assistance, Nurse Cumbo saw Sams in Medical.  LPN Cumbo noted that Sams "'states that she has **nausea x 2, HA** [headache] **x 4 days with pressures in both ears and facial pain with hot and cold flashes**.'" (Compl. ¶ 34.)  Nurse Cumbo wrote that "'Information [was] given'" to Nurse Practitioner Harris but the Complaint reflects "there is no record indicating that Harris . . . or any other nurse practitioner or physician saw . . . Sams that day or the next." (*Id.*)  Sams states that "the records indicate that an LPN (Cumbo) saw . . . Sams without supervision" and there exists "no record of any treatment provided to . . . Sams at this time." (*Id.*)  "Records indicate that . . . Sams was simply returned to her cell." (*Id.*)

###   e.     Sams's Fifth Request for Medical Assistance

On September 12, 2018, at about 3:13 p.m., shortly after being returned to her cell from Medical, Sams made another Medical Sick Call Request through OMS.  (Compl. ¶ 35.)  Sams wrote:

> **Im still sick worse then yesterday/late lastnight**. I was given medication For nauseua may I request more please. I was given aspirin it seems to totally mess my stomach up worst then ever **im not better and <u>pledding mercy for more help</u>** Thank you

(*Id.*)  At about 3:26 p.m., EMT Kelske wrote in response:  "you were also prescribed medication for nausea and vomiting." (*Id.* ¶ 36.)  Shortly thereafter, Kelske "marked . . . Sams's recent

Medical Sick Call Request as "'**Closed**.'"  (*Id.*)  "There is no record indicating that Kelske, or any other medical care provider, saw . . . Sams in response to this request."  (*Id.*)

### f.  Sams Continues to Experience Symptoms

On September 12, 2018, at about 8:36 p.m., Sams wrote another Medical Sick Call Request through OMS, stating:  "'I was given one pill for nauseua.  No prescription given.  May I request the percription or another pill.'"  (Compl. ¶ 37.)  A non-defendant nurse replied, stating that:  "'[y]ou have a prescription for Zofran until 9/16/18.  You just need to request it during pill call,'" and Sams's Medical Sick Call Request was marked closed.  (*Id.* ¶ 38.)  The following day, on September 13, 2018, Harris "did not examine" Sams, and no vital signs of Sams were taken. (*Id.* ¶ 39.)

### g.  Sams's Sixth Request for Medical Assistance

On September 14, 2018, three days after Sams's first request for medical assistance and six days after the onset of her symptoms, Nurse Practitioner Harris evaluated Sams in the Medical department at the Regional Jail.  (Compl. ¶ 40.)  "Records indicate that . . . Sams was escorted to Medical at about 7:24 a.m., but the first relevant orders were entered at 9:01 a.m. and the nurse practitioner's notes are time stamped 10:18 a.m."  (*Id.*)

ARNP Harris noted that "'[Sams] seen today for **continued headache x 4 days** with **associated nausea and vomiting**.'"  (*Id.* ¶ 41.)  Harris wrote that Sams "'reports that **her headaches start up the back of her neck and around her head**'" and that she "'**has never had a headache like this**.'"  (*Id.*)  ARNP Harris noted that "'[Sams] reports that it was getting better **but then it ramped back up again'**" and that "'[Sams] **reports difficulty holding down any food or liquid at this time**.'"  (*Id.*)  "A low pulse (heart rate) of 53 was recorded for . . . Sams." (*Id.*)

11

Sams avers that despite her "obviously emergent condition – one that required that . . . Sams be sent out immediately to a hospital," Harris merely "gave . . . Sams a routine pain medication (Ibuprofen) and a nausea/vomiting medication (Promethazine)."  (*Id.* ¶ 42.)  "These kinds of medications had not previously effectively resolved . . . Sams's serious and worsening condition, and Harris, the previous prescriber, knew this."  (*Id.*)  ARNP Harris also gave Sams "additional pain medication" while Sams was in Medical, "suggest[ing] that . . . Sams's pain continued or worsened on September 14 under . . . Harris's care."  (*Id.*)

Harris then "simply directed or caused . . . Sams to be returned to . . . Sams's jail housing unit" without "having made a determination as to the cause of . . . Sams's ongoing serious condition or elevating . . . Sams to a higher level of care."  (*Id.* ¶¶ 42–43.)  ARNP Harris "made no more chart notes that day . . . including no documentation suggesting that . . . Sams's condition had improved."  (*Id.* ¶ 42.)

### h.      Sams Begins to Exhibit Symptoms of an Altered Mental State on the Night of September 14, 2018

On September 14, 2018 at 8:00 p.m., Armor's records indicate that Murrell "dispensed Promethazine to . . . Sams." (Compl. ¶ 46.)  Sams avers that due to her "documented condition preceding, at the time of, and/or following Murrell's encounter with . . . Sams . . . indicates that Murrell, LPN learned of . . . Sams's abnormal and altered mental status condition and other signs and complaints of severe medical distress (headache, photophobia, nausea, and vomiting)."  (*Id.*)  Despite this knowledge, and Murrell's responsibility to ensure patients receive proper care, Sams asserts that Murrell, "like her other Armor colleagues and correctional officers Robinson and Turner, disregarded . . . Sams's condition."  (*Id.*)  LPN Murrell "did not notify a doctor or nurse practitioner, and she did not call 911 or otherwise cause . . . Sams to be transported to a hospital."  (*Id.*)

12

On the night of September 14, 2018, Sams began "showing signs of altered mental status." (*Id*. ¶ 44.) Sams "'**was observed by staff to be acting abnormal** [on September 14,], **putting matches**[10] **on her cellmate and laying on top of them.**" (*Id.*) Sams states, "upon information and belief," that Correctional Officers Robinson and Turner were the "staff" mentioned in the Memorial Regional Hospital ED records [where Sams was later treated] who "observed . . . [Sams] **acting abnormal <u>since last night</u>**."[11] (*Id*. ¶ 9.) According to PRJA staff, and as reflected in the medical records, Sams "'**was complaining of a [headache] last night with associated photophobia** [painful oversensitivity to light], **nausea, and vomiting . . . .**'" Sams's roommate stated "**[Sams] was 'acting funny' last night**." (*Id*. ¶ 44.)

Sams avers that Officers Robinson and Turner, who were assigned to "among other units . . . Sams's H Unit on the night shift for September 14, 2018, failed to provide . . . Sams with access to medical care despite her abnormal, altered mental status and other obvious signs and complaints of severe medical distress." (*Id*. ¶ 45.)

### i.   Sams's Altered Mental Status and Symptoms Continue into the Morning of September 15, 2018

Sams states that her medical records show that her "altered mental status that had begun the **previous evening** (**September 14**) had not abated, but continued throughout the night and into the morning of September 15, 2018." (Compl. ¶ 48.)

---

[10] In the Complaint, Sams commonsensically notes that "matches" may be a "typographical error" for "mattresses" because "inmates are generally prevented from having matches and a mattress is something that one can lie on top of." (Compl. 17 n.4)

[11] Sams alleges that the Memorial Regional records indicate that Sams's medical "'history was taken from 1 of the prison agent as patient was unable to contribute to any history. Per agent, patient has been complaining of headaches since last Tuesday [September 11, 2018] and had episodes of nausea and vomiting.'" (Compl. ¶ 44 n.5.)

On the morning of September 15, 2018, Memorial Regional medical records further indicate that "'[**altered mental status**] was noted by [PJRA] **staff this morning <u>around 6:30 hrs</u>**.'"  (*Id.* ¶ 47.)  At about 8:43 a.m., "'a nurse entered . . . Sams's unit 'to assist' an officer 'with inmate Sams.'"  (*Id.* ¶ 48.)  Sams alleges that Correctional Officers Key and Stith "who were specifically assigned to, . . . Sams's H Unit on the morning of September 15, 2018, long failed to provide . . . Sams with access to medical care, failing to call Medical until about 8:43 a.m."  (*Id.*)

According to a report filed by non-defendant Correctional Sergeant Michael J. DeVaughn, the Regional Jail's shift commander for the morning of September 15, 2018, Correctional Officer Key summoned Sergeant DeVaughn to Sams's cell.  (*Id.* ¶ 49.)  Sergeant DeVaughn arrived at about 9:00 a.m. and found Sams "'standing up in her cell and not appearing to be alert.'"  (*Id.* ¶ 49.)  Key informed Sergeant DeVaughn that "'Sams seemed to have an altered mental state and had thrown up in the cell . . . " and DeVaughn noted that "'there was a pool of yellow bile in the cell.'"  (*Id.* ¶ 50.)  DeVaughn noted that he was informed that Sams "'had been having medical issues earlier in the day and seemed to be very confused/lethargic.'"  (*Id.* ¶ 51.)

DeVaughn and two officers attempted to move Sams downstairs to Medical but Sams "'had difficulty walking and navigating the stairs as she did not open her eyes and her movements were very jerky.'"  (*Id.* ¶ 53.)  Nurses at Medical informed the officers that Sams "needed to go to the hospital by ambulance" and "EMS was called."  (*Id.* ¶ 56.)  Sams claims that if "***the Defendants [had] sent . . . Sams to the hospital just a few hours earlier, her outcome would have been significantly improved***."  (*Id.* ¶ 48.)

**j.**     **Initial Assessments of Sams at PJRA Medical and by EMS**

The medical records at the Regional Jail reflect that at roughly 9:00 a.m. on the morning of September 15, 2018, Sams was "'transported to exam area by wheelchair'" after correctional officers transported her to Medical. (Compl. ¶ 57.) The reporting non-defendant nurse wrote that the "'Type of Urgent Situation'" was "'Acute Medical Condition (e.g. loss of consciousness, seizure, etc.).'" (*Id.*) The nurse reported that Sams showed an "'altered level of consciousness, could not follow commands, tried to take blood pressure cuff off.'" (*Id.*) Sams had "a low pulse of 46 . . . a high temperature of 102 . . . 'pale, warm, flushed skin' . . . [and] . . . was 'unable to speak or follow commands.'" (*Id.*)

Sams states that despite "her days-long medical complaints and requests for care, Regional Jail medical personnel apparently wrongly concluded that . . . Sams's altered mental status was caused by a drug overdose." (*Id.* ¶ 60.) Emergency Medical Services ("EMS") listed the "'Call Type'" as "'Overdose/Poisoning/Ingestion.'" (*Id.*) EMS also noted that Sams was "'given 5mg Narcan before arrival' . . . a medication that counteracts effects of an opioid overdose." (*Id.*)

The EMS report notes that staff at PRJA stated that Sams had a "'**[h]istory of headaches for the past two weeks** and '**just not acting herself.**'" (*Id.* ¶ 61.) According to EMS, Sams needed "'help moving and inability to stand'" and was "'unable to answer questions in a coherent manner.'" (*Id.*)

**k.**     **Assessment of Sams at Memorial Regional**

On September 15, 2018, at 9:54 a.m., roughly an hour after Armor medical personnel first arrived at Sams's cell, Sams arrived at Memorial Regional. (Compl. ¶ 66.) Physicians at Memorial Regional thereafter diagnosed Sams with "among other conditions, 'acute bacterial

15

endocarditis . . . severe sepsis secondary to MV endocarditis[12] . . . Cerebrovascular accidents (CVA) . . . and . . . acute encephalopathy due to embolic stroke.'"  (*Id.* ¶ 68.)  Memorial Regional records indicate Sams had a "[r]ecurrent fever and acute encephalopathy [a disorder or disease of the brain] with severe progressive brain lesions, failed treatment for severe sepsis due to MV endocarditis."  (*Id.* ¶ 73.)  Sams claims this diagnosis shows that she "suffered brain damage due to untreated endocarditis."  (*Id.*)

Sams asserts that "[o]n September 20, 2018, upon information and belief, at the urging of Regional Jail personnel . . . Sams's bond was modified to be '$2,000 Unsecured.'"  (*Id.* ¶ 71.) This modification of Sams's bail status "caused the costs of care to be shifted from the Regional Jail to . . . Sams; it saddled . . . Sams with several hundreds of thousands of dollars in medical bills."  (*Id.*)

Memorial Regional records "indicate the severe physical deficits caused by the stroke." (*Id.* ¶ 75.)  These records depict the "profound effects of the preventable stroke suffered" by Sams.  (*Id.* ¶ 78.)  Two weeks following her stroke, an occupational therapist observed that Sams "'demonstrates difficulty with functional use of her right hand'" and set as a goal, the following week, Sams "being able to sit up in bed with assistance."  (*Id.* ¶ 75.)  Sams "remained hospitalized at Memorial Regional for one month, until October 15, 2018" and "was thereafter hospitalized at VCU Medical Center from October 16, 2018 through October 29, 2018."  (*Id.* ¶¶ 79–80.)  "Sams remains today with significant speech, motor, and cognition difficulties . . . , [which] will remain with her for the rest of her life."  (*Id.* ¶ 81.)

---

[12] Endocarditis "is an infection of the endocardium, which is the inner lining of your heart chambers and heart valves."  *See Diseases and Conditions*: *Endocarditis*, MAYO CLINIC (Sept. 30, 2020), https://www.mayoclinic.org/diseases-conditions/endocarditis/symptoms-causes/syc-20352576.  If "not treated quickly, endocarditis can damage or destroy your heart valves and can lead to life-threatening complications."  *Id.*

Sams seeks joint and several damages from all Defendants in the amount of $15,000,000 "or in such greater amount to be determined at trial, costs, pre-judgment interest, attorney's fees (in connection with the federal civil rights claims)." (*Id.* 36.)

## B.   Procedural History

On September 2, 2019, Sams filed her thirty-seven page Complaint in this Court.  Sams brings three counts:

**Count I:**   **The Negligence Claim:**  The Defendants breached their duty of care towards Sams, and as a "direct and proximate cause of th[at] negligence" Sams "suffered great physical pain, and mental anguish, and economic losses" in violation of Virginia law;

**Count II:**   **The Gross Negligence Claim:**  The Defendants "showed such a level of indifference to . . . Sams so as to constitute an utter disregard of prudence, amounting to a complete neglect for . . . Sams's safety" and as a "direct and proximate cause of th[at] negligence" Sams "suffered great physical pain, and mental anguish, and economic losses" in violation of Virginia law; and,

**Count III:**   **The Deliberate Indifference Claim:**  The Individual Defendants (Harris, Kelske, Cumbo, Murrell, Robinson, Turner, Key, and Stith) acted with "deliberate indifference to . . . Sams's health and safety, thereby placing . . . Sams in substantial risk of serious harm" in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

(Compl. ¶¶ 107, 112, 120.)

The Defendants filed their Motions to Dismiss pursuant to Rule 12(b)(6), (ECF Nos. 11, 15, 20, 22, 41), and PRJA filed its Motion to Certify Question of State Law to the Supreme Court of Virginia, (ECF No. 29).  In the Motions to Dismiss, Defendants generally challenge the sufficiency of Sams's allegations regarding her claims of gross negligence and deliberate indifference; they do not challenge, at this procedural posture, whether they are subject to Sams's Negligence Claim except if sovereign immunity applies.  PRJA, in its Motion to Dismiss, states that as a regional jail authority it is entitled to sovereign immunity under Virginia law, and

therefore argues that both Sams's Negligence Claim and Gross Negligence Claim against it should be dismissed.  (*See* Mem. Supp. PRJA Mot. Dismiss 1, ECF No. 21.)  The Individual PRJA Defendants also assert that "they are immune from simple negligence" because of PRJA's sovereign status, but do not otherwise contest the negligence claim against them if PRJA is not entitled to sovereign immunity.  (*See* Mem. Supp. PRJA Individual Defs. Mot. Dismiss 13, ECF No. 23.)

For the reasons stated below, the Court will grant in part and deny in part the Motions to Dismiss.  First, the Court will deny the Motion to Certify and the PRJA Motion to Dismiss on the grounds of sovereign immunity.  (ECF Nos. 20, 29.)  Second, because the Court will deny the PRJA Motion to Dismiss, it will proceed to examine Sams's claims for gross negligence and deliberate indifference against Defendants.  The Court finds, as to the deliberate indifference claims, that Sams has stated a claim against ARNP Harris, EMT Kelske, and Officers Robinson and Turner, but not against LPNs Cumbo and Murrell or Officers Key and Stith.  Continuing to Sams's gross negligence claims, the Court concludes that Sams has stated a claim for gross negligence against Harris, Kelske, Robinson, Turner, and by virtue of the doctrine of *respondeat superior*, Armor and PRJA.  In contrast, Sams has not stated a claim for gross negligence against Cumbo, Murrell, Key, and Stith.

As such, the Court will grant the Murrell Motion to Dismiss, (ECF No. 41), grant in part and deny in part the Armor Individual Defendants Motion to Dismiss and the PRJA Individual Defendants Motion to Dismiss, (ECF Nos. 15, 22), and deny the Armor Motion to Dismiss, the PRJA Motion to Dismiss, and the PRJA Motion to Certify, (ECF Nos. 11, 20, 29.)

## II.  Standard of Review

### A.      Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint;

importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952

(4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and*

*Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain

sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that

states a claim for relief must contain . . . a short and plain statement of the claim showing that the

pleader is entitled to relief.").  Mere labels and conclusions declaring that the plaintiff is entitled

to relief are not enough. *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing

necessitate some factual enhancement within the complaint to cross the line between possibility

and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193

(4th Cir. 2009) (citations omitted).

A complaint achieves facial plausibility when the facts contained therein support a

reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S.

at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This analysis is context specific and

requires "the reviewing court to draw on its judicial experience and common sense." *Francis*,

588 F.3d at 193.  The Court must assume all well pleaded factual allegations to be true and

determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to

an entitlement to relief." *Iqbal*, 556 U.S. at 678–79; *see also Kensington*, 684 F.3d at 467

(finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of

19

the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *Kolon Indus., Inc.*, 637 F.3d at 440)).  This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679

### III.  The Motion to Certify

PRJA asks this Court to certify to the Virginia Supreme Court the question of whether PRJA, as a Regional Jail Authority, and its employees are entitled to sovereign immunity under the laws of Virginia.  Specifically, PRJA seeks certification of the following question (the "Sovereign Immunity Question"):

> Is a jail authority created by and operated pursuant to Virginia Code §§ 53.1-95.2, *et seq.*, entitled to the protection of sovereign immunity under Virginia law?

(PRJA Mot. Certify 1, ECF No. 29.)  For the reasons set forth below, the Court will decline to certify this Sovereign Immunity Question.

### A.      Legal Standard:  Certification to the Virginia Supreme Court

Under Rule 5:40 of the Rules of the Supreme Court of Virginia, a federal district court may certify a question of Virginia law, so long as that question "is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of [the Supreme Court of Virginia] or the Court of Appeals of Virginia."  Va. Sup. Ct. R. 5:40(a).  "The decision to certify, however, rests in the sound discretion of the federal court."  *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 n. 7 (2018) (internal quotation marks and citation omitted); *see also Burke v. THOR Motor Coach*, *Inc*., 113 F. Supp. 3d 863, 866 (E.D. Va. 2015) (accord).  The district court should certify the issue to state court

"[o]nly if the available state law is clearly insufficient." *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994) (internal citation omitted). "Where there is no case law from the forum state which is directly on point, the district court attempts to do as the state court would do if confronted with the same fact pattern." *Id*.

"[T]he discretion to certify should be cautiously exercised." *West Am. Ins. Co. v. Bank of Isle of Wight*, 673 F. Supp. 760, 764 (E.D. Va. 1987). District courts remain "under a duty to decide questions of state law, even if difficult and uncertain, when necessary to render judgment." *Legard v. EQT Prod. Co*., 771 F. Supp. 2d 607, 609 (W.D. Va. 2011). "[C]ertification is never compelled." *Id*. In weighing the burden of certification, the district court should consider "not only the imposition on the time and resources of the Supreme Court of Virginia, but also the effect on the time and resources of the parties, the protraction of the proceedings, and judicial efficiency." *Burke*, 113 F. Supp. 3d at 866 (internal citations and quotations omitted). Certification, even if permitted, "entails more delay and expense than would an ordinary decision of the state question on the merits by the federal court." *Lehman Bros v. Schein*, 416 U.S. 386, 394 (1974) (Rehnquist, J., concurring).

### B.   Because the Question of PRJA's Sovereign Immunity Is Not Sufficiently Dispositive and Ample Recent Precedent Exists to Guide the Court on the Issue, the Court Will Deny the Motion to Certify

Because the Court finds that the Sovereign Immunity Question is not sufficiently dispositive and that ample state and federal authority can guide the Court's analysis, the Court will deny the PRJA Motion to Certify.

### 1.   The Sovereign Immunity Question Is Not Sufficiently Dispositive and Would Therefore Unjustifiably Delay the Suit at Bar

The Court finds the Sovereign Immunity Question is not sufficiently dispositive to warrant certification. The Sovereign Immunity Question would affect only Sams's claims

21

against the PRJA Defendants—that is, PRJA and Correctional Officers Robinson, Turner, Key, and Stith.

The Armor Defendants—Armor, Harris, Kelske, Cumbo, and Murrell—do not suggest entitlement to sovereign immunity.  In the Complaint, Sams states that Defendants Armor, Harris, Kelske, Cumbo, and Murrell worked at all times as independent contractors.  (*See* Compl. ¶ 17 ("Armor and its employees/agents, at all relevant times, provided services to the Regional Jail as an independent contractor").)  And the Supreme Court of Virginia has found that outside companies and employees providing medical services to Virginia state prisons act as independent contractors that are not entitled to sovereign immunity.  *Ogunde v. Prison Health Servs*., 645 S.E.2d 520, 523–25 (Va. 2007) (reversing trial court's finding that prison health services company was entitled to sovereign immunity based on provision of services to state prisons). While the *Ogunde* Court focused on the "'the power of control'" the Commonwealth did or did not exert over the independent contractor, that decision demonstrates that Armor, Harris, Kelske, Cumbo, and Murrell would not be able to claim sovereign immunity for their actions solely by virtue of the Virginia Supreme Court's ruling on the Sovereign Immunity Question.  *Id*. at 524; *see also Brown v. Mitchell*, 327 F. Supp. 2d 615, 661 (E.D. Va. 2004) (finding a prison doctor could not share in the City of Richmond's sovereign immunity because "only municipal employees are entitled to share in the sovereign immunity of their municipal employers; independent contractors acting on behalf of the municipality are not entitled to this protection."). Thus, even if the Court were to certify the Sovereign Immunity Question, it would have no effect upon the Armor Defendants' status.

Resolution of the Sovereign Immunity Question by the Virginia Supreme Court also would not prove fully dispositive of the claims against two of the PRJA Defendants.  "Virginia's

sovereign immunity doctrine protects officers only for simple negligence . . . [s]overeign immunity does not protect one who acts 'wantonly, or in a culpable or grossly negligent manner.'" *Cromartie v. Billings*, 837 S.E.2d 247, 254 (Va. 2020) (internal citations and quotations omitted). As set forth below, the Court has determined that Sams has stated a claim for deliberate indifference against Robinson and Turner and for gross negligence against Robinson, Turner, and PRJA. Therefore, a ruling from the Virginia Supreme Court would not prove dispositive as to Correctional Officers Robinson and Turner, who would continue in this action regardless of the Virginia Supreme Court's decision on the Sovereign Immunity Question.

While a court need not certify a question *only* when the answer would fully dispose of all of the issues before it,[13] further delays and litigation expense weigh against certification. Courts have recognized that certification "entails more delay and expense than would an ordinary decision of the state question on the merits by the federal court." *Schein*, 416 U.S. at 394. Certification here could prove dispositive to Sams's claims against only three of the ten Defendants in this action. Considering the "the effect on the time and resources of the parties, the protraction of the proceedings, and judicial efficiency," *Burke*, 113 F. Supp. 3d at 866, certification to the Virginia Supreme Court would unjustifiably delay the proceedings before this Court for both Sams and Defendants.

---

[13] PRJA, citing the Virginia Supreme Court's decision in *Wyatt v. McDermott,* argues that a question need not resolve all claims in a litigation to prove "dispositive" under Rule 5:40. 725 S.E.2d 555 (Va. 2012). In *Wyatt*, the Virginia Supreme Court accepted a certified question regarding Virginia state law claims for tortious interference of parental rights although that claim was just one of many pending before the federal district court. *Id.* at 557 n.1. Although certification here could prove dispositive as to PRJA's negligence claims—and thus might technically meet the requirements for certification under Rule 5:40—the Court finds certification unnecessary and inappropriate for the reasons stated above.

2.   **The Available Authority on the Sovereign Immunity Question Issue Demonstrates that Certification to the Virginia Supreme Court Is Unnecessary and Inappropriate**

The Court also determines that the ample authority within Virginia state courts and federal courts in the United States District Court for the Eastern and Western Districts of Virginia on the Sovereign Immunity Question cautions against certification.

The Virginia Supreme Court has designated the framework for addressing whether an entity such as PJRA qualifies as a municipal corporation, and thus would be entitled to sovereign immunity under Virginia law. *See Hampton Rds. Sanitation Dist. Com. v. Smith*, 68 S.E.2d 497 (Va. 1952). Several decades after *Hampton Roads*, the Virginia Supreme Court reiterated the *Hampton Roads* factors in considering when an entity qualified as a municipal corporation, examining those "attributes of a municipal corporation which we deem[] essential to viability as a municipal corporation." *Richmond v. Richmond Metro. Auth.*, 172 S.E.2d 831–32 (Va. 1970); *see also Va. Elec. & Power Co. v. Hampton Redev. & Housing Auth.*, 225 S.E.2d 364, 367 (Va. 1976) (*VEPCO*). Furthermore, at least one Virginia court, applying the factors set forth in *Richmond Metro Authority*, has concluded that regional jail authorities are not municipal corporations and are therefore not entitled to sovereign immunity. *Finamore v. Trent*, 95 Va. Cir. 38, 42 (Va. Cir. Ct. 2016) (finding that "designation as a body politic and vestiture with the power of eminent domain . . . are fundamental attributes" of a municipal corporation).

Federal courts sitting in Virginia have routinely applied the framework established in *Hampton Roads*, *Richmond Metropolitan Authority*, and *VEPCO* when deciding whether regional jail authorities are municipal corporations entitled to sovereign immunity.[14] Thus, while

---

[14] Twelve out of the thirteen federal district court cases have been decided in the last eight years. *See Caramillo v. Correct Care Sols., LLC*, No. 2:19cv362, 2020 WL 4747786, at *4 (E.D. Va. Feb. 28, 2020), *report and recommendation adopted*, No. 2:19cv362, 2020 WL

the Virginia Supreme Court has never resolved whether sovereign immunity applies to PJRA, the framework by which to resolve the matter is well-settled.

More than a dozen federal courts in the Eastern and Western Districts of Virginia have used this framework to address the sovereign immunity of a regional jail authority based on its status as a municipal corporation.  Even acknowledging that these cases diverge and that the United States Court of Appeals for the Fourth Circuit has not spoken, this abundance of precedent cautions against certification.  *See Legard*, 771 F. Supp. 2d at 610 (declining to certify question to Virginia Supreme Court where "the issue has been addressed and decided by multiple other jurisdictions, supplying assistance for this court's benefit in predicting Virginia law").

---

2468769 (E.D. Va. May 13, 2020) (finding no sovereign immunity); *Wright v. Va. Peninsula Reg'l Jail Auth.*, No. 2:19cv189, 2020 WL 1055665, at *15 (E.D. Va. Mar. 4, 2020) (finding no sovereign immunity); *Tilson v. Humphrey*, No. 5:19cv033, 2019 WL 6902677 (W.D. Va. Dec. 18, 2019) (finding sovereign immunity); *McCaffrey v. Va. Peninsula Reg'l Jail Auth.*, No. 4:18cv154, 2019 WL 5445752, at *5–8 (E.D. Va. Oct. 4, 2019), *report and recommendation adopted*, No. 4:18cv154, 2019 WL 5445296 (E.D. Va. Oct. 23, 2019) (finding no sovereign immunity); *Keeling v. Correct Care Sols., LLC*, No. 2:19cv225, 2019 U.S. Dist. LEXIS 230903 (E.D. Va. Sep. 23, 2019) (finding no sovereign immunity); *Costine v. Correct Care Sols., LLC*, No. 2:19cv53, 2019 WL 2775491, at *6 (E.D. Va. July 2, 2019) (finding sovereign immunity); *Thrower v. Correct Care Sols.*, No. 2:18cv56, 2019 U.S. Dist. LEXIS 230870 (E.D. Va. Apr. 3, 2019) (finding no sovereign immunity); *Haleem v. Quinones*, No. 5:17cv00003, 2017 WL 4400767, at *7 (W.D. Va. Sept. 30, 2017) (finding sovereign immunity); *Thornhill v. Aylor*, No. 3:15cv00024, 2017 WL 2304225, at *2 (W.D. Va. May 25, 2017) (declining to certify similar question to the Virginia Supreme Court and finding no sovereign immunity); *Heywood v. Va. Peninsula Reg'l Jail Auth.*, No. 2:15cv195, 2015 WL 5026188, at *8 (E.D. Va. Aug. 21, 2015) (finding no sovereign immunity); *Dowdy v. PRJA Reg'l Jail Auth.*, No. 3:14cv003, 2014 WL 2002227, at *3 (E.D. Va. May 15, 2014) (finding sovereign immunity); *Boren v. Nw. Reg'l Jail Auth.*, No. 5:13cv013, 2013 WL 5429421, at *4 (W.D. Va. Sept. 30, 2013) (finding no sovereign immunity), abrogated by *Tilson*, 2019 WL 6902677, at *5; *Heckenlaible v. Va. Reg'l Peninsula Jail Auth.*, No. 4:06cv25, 2006 WL 3196750, at *1 (E.D. Va. Nov. 1, 2006) (finding no sovereign immunity).  Although some have reached different conclusions—with nine finding regional jails do not possess sovereign immunity—the reasoning of these sister federal courts provides additional experience and precedent on which this Court can rely in determining how the Virginia Supreme Court would rule "if confronted with the same fact pattern."  *Doe*, 28 F.3d at 407.

Eight of these cases—including seven in the Eastern District of Virginia—have concluded that regional jails are not municipal corporations entitled to sovereign immunity.

Notably, another case in the Western District of Virginia declined to certify essentially this very question in 2017 because "available authority on the issue demonstrates that certification is unnecessary and inappropriate." *Thornhill*, 2017 WL 2304225, at *2. Seven federal courts weighed in on this issue *after* the *Thornhill* Court found it had all necessary authority.

Keeping in mind its duty to "decide questions of state law, even if difficult and uncertain," *Legard*, 771 F. Supp. 2d at 609, and because the Sovereign Immunity Question is not fully dispositive and would unduly and unjustifiably delay the litigation at bar for Sams and seven of the ten Defendants, the Court declines to certify the Sovereign Immunity Question to the Virginia Supreme Court. Although the Virginia Supreme Court has not resolved this issue, Virginia law on this matter is not "clearly insufficient," *Doe*, 28 F.3d at 407 (internal citation omitted), and federal case law provides ample precedent for guiding this Court in its analysis. The Court therefore exercises its discretion to deny the Motion to Certify.

The Court turns to the substance of the Sovereign Immunity Question, joining the majority of federal district courts in Virginia in finding that regional jails such as PRJA are not municipal corporations entitled to sovereign immunity.

### IV.  The PRJA Motion to Dismiss on Sovereign Immunity Grounds

The Court will deny PRJA's Motion to Dismiss on sovereign immunity grounds. In doing so, the Court joins the majority of courts in the Eastern and Western District of Virginia that have found regional jail authorities in the Commonwealth of Virginia are not municipal corporations entitled to sovereign immunity.

## A.   <u>Legal Standard:  Sovereign Immunity of Municipal Corporations in Virginia</u>

 "The doctrine of sovereign immunity remains 'alive and well in Virginia.'"  *Pike v. Hagaman*, 787 S.E.2d 89, 92 (Va. 2016) (quoting *Com. ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n*, 768 S.E.2d 79, 89 (Va. 2014)); *see also Guerrero v. Deane*, No. 1:09cv1313, 2010 WL 670089, at *13 (E.D. Va. Feb. 19, 2010) (citations omitted).  Sovereign immunity creates "a bar to the plaintiff's right of recovery."  *Pike*, 787 S.E.2d at 92 (citation omitted).  The doctrine of sovereign immunity bars state tort claims against the Commonwealth of Virginia unless the Commonwealth consents to certain claims or legal actions.  *VEPCO,* 225 S.E.2d at 367.

An entity created under Virginia law may establish that it is immune from tort liability in one of two ways.  First, the entity may establish that "it is entitled to the Commonwealth's broad immunity from tort liability by showing that it is an arm or agency of the state."  *Heckenlaible*, 2006 WL 3196750, at *2 (citing *VEPCO*, 225 S.E.2d at 367.)  However, an "entity is not an arm or agency of the Commonwealth where, although state law authorizes the creation of the entity, the actual creation of the entity requires 'local activation' by one or more counties or municipalities."  *Id*. (quoting *VEPCO*, 225 S.E.2d at 367).

Second, the entity may demonstrate through the two-step inquiry set forth in *Hampton Roads* that "it is entitled to the immunity afforded a municipal corporation by showing that it is appropriate for the court to treat the entity as such."  *Id*.  A municipality or municipal corporation may receive "protection under Virginia law, but it 'is not entitled to the same immunity from tort liability that is enjoyed by the Commonwealth.'"  *Heckenlaible*, 2006 WL 3196750, at *2 (quoting *VEPCO*, 225 S.E.2d at 368).  Because a "municipality acts in a dual capacity, the one governmental and the other proprietary" the municipality is only immune from torts in its performance of "governmental functions."  *VEPCO*, 225 S.E.2d at 368.

27

To determine whether a particular entity constitutes a municipal corporation a court must undertake a two-step analysis.  First, the court must assess "what attributes of municipality the entity possesses."  *VEPCO*, 225 S.E.2d at 367 (citing *Hampton Rds.,* 68 S.E.2d at 500).  Second, the court must consider "in light of this initial consideration, the particular purpose for determining whether a municipal corporation is present."  *Id*.

As to the first step, municipality attributes, there are six "attributes" that may be "deemed essential to viability as a municipal corporation."  (*Id*.)  Those six attributes of a municipal corporation are:

> (1) Creation as a body corporate and politic and as a political subdivision of the Commonwealth;
>
> (2) Creation to serve a public purpose;
>
> (3) Power to have a common seal, to sue and be sued, to enter into contracts, to acquire, hold and dispose of its revenues, personal and real property;
>
> (4) Possession of the power of eminent domain;
>
> (5) Power to borrow money and issue bonds which are tax exempt, with interest on such bonds enjoying the same status under tax laws as the interest on bonds of other political subdivisions of the state; and,
>
> (6) Management of the corporation vested in a board of directors or a commission.

*Id.* (citing *Hampton Rds*., 68 S.E.2d at 500.)  The Virginia Supreme Court has cautioned that although these six factors are "pertinent to" the inquiry of whether an entity is a municipal corporation, a municipal corporation need not necessarily possess all six.  *York Cnty. v. Peninsula Airport Comm'n*, 369 S.E.2d 665, 666 (Va. 1988); *see also Hampton Rds.*, 68 S.E.2d at 501 ("While it is true that the more attributes of a municipal corporation an agency has the more likely it is to be treated as a municipal corporation, the final decision rests on the specific issue of each case.").  The entity should be recognized as a municipal corporation if "it appears

that the legislature intended that they should be so construed." *York*, 369 S.E.2d at 666 (quoting *Hampton Rds.,* 68 S.E.2d at 499).

As to the second step of the inquiry, the particular purpose, the "Supreme Court of Virginia has instructed courts to look at the purpose for which the entity is seeking to be treated as a municipal corporation." *Heywood*, 2015 WL 5026188, at *6 (citing *VEPCO*, 225 S.E.2d at 367). A local entity "may be held to be a municipal corporation for some purposes, but not for others." *Hampton Rds.,* 68 S.E.2d at 501.[15] The Virginia Supreme Court has stated that "if the pivotal point under consideration involves a matter of procedure, there is more likelihood that a particular entity will be declared a municipal corporation; but if a point of substantive law is involved, it is less likely that the entity will be declared a municipal corporation." *VEPCO*, 225 S.E.2d at 367. The Court utilizes this two-step inquiry when reviewing PRJA's claim of sovereign immunity when finding that PRJA is not immune.

---

[15] PRJA argues that although "the Supreme Court of Virginia no longer relies on a procedural/substantive dichotomy—i.e., determining the applicability of sovereign immunity does not turn on whether the purpose for which it is sought is a procedural or substantive one—several federal courts continue to rely on this outdated framework." (Reply PRJA Mot. Certification 6, ECF No. 39.) In support of this argument, PRJA states that *VEPCO* showed that the "procedural/substantive dichotomy no longer applie[s]" to the second prong. (*Id.*) PRJA misreads *VEPCO*. *VEPCO* did not state that the dichotomy no longer applied, but that the rule was "not inflexible" and the circumstances of *that* case warranted focusing on whether a housing authority was performing a governmental or proprietary function. *VEPCO*, 225 S.E.2d at 367. Indeed, the *VEPCO* Court explicitly adopted the same language regarding the procedural and substantive divide from *Hampton Roads*, s*ee id*., and at least one Virginia court has applied that same rationale in determining that regional jail authorities are not municipal corporations, *see Finamore*, 95 Va. Cir. at 43.

**B.** **PRJA Is Not a Municipal Corporation Entitled to Sovereign Immunity for Substantive Tort Claims**

Following the two-step inquiry set forth in *Hampton Roads*, PRJA, as regional jail authority, is not a municipal corporation entitled to sovereign immunity.[16] First, looking to the six attributes of municipal corporations outlined by the Virginia Supreme Court in *Hampton Roads*, the Court determines that because PRJA lacks two intrinsic attributes of municipal corporations—creation as a political subdivision and the power of eminent domain—it should not be viewed as one. Second, the Court finds that the second *Hampton Roads* factor, the purpose for which PRJA seeks designation as a municipal corporation, weighs neither for nor against a finding of municipal corporation status. Accordingly, the Court joins the nine district courts in Virginia to have concluded that regional jail authorities such as PRJA are not municipal corporations entitled to sovereign immunity under Virginia law.

**1.** **First Prong:  PRJA Lacks Two Intrinsic Attributes of Municipal Corporations**

The Parties agree that PRJA, as a regional jail authority, possesses only four of the six attributes of a municipal corporation. (Mem. Supp. PRJA Mot. Dismiss 6–7; Resp. Opp. PRJA Defs. Mot. Dismiss 7, ECF No. 32.) But this does not end the Court's analysis. While the PRJA was created to serve a public purpose, has a common seal, can borrow money and issue bonds, and has management vested in a board of directors, it lacks two attributes that constitute the core of what defines a municipal corporation:  "[c]reation as a body corporate and politic and as a

---

[16] PRJA, correctly, does not contend that it is entitled to sovereign immunity as "an arm or agency of the state." *Heckenlaible*, 2006 WL 3196750, at *2 (quoting *VEPCO*, 225 S.E.2d at 367.) The Fourth Circuit has concluded that regional jail authorities in Virginia do not qualify as an arm or agency of the Commonwealth. *See Kitchen v. Upshaw*, 286 F.3d 179, 184 (4th Cir. 2002) ("the Regional Jail Authority is not an arm of the State for purposes of Eleventh Amendment immunity."). Therefore, the only issue before this Court is whether PRJA is entitled to sovereign immunity as a municipal corporation under Virginia law.

30

political subdivision of the Commonwealth" and the "power of eminent domain." *Richmond Metro. Auth.*, 172 S.E.2d at 832 (citing *Hampton Rds.*, 68 S.E.2d at 500.)

Because these two missing attributes "are those most intrinsic to municipal corporations,"[17] *Heywood*, 2015 WL 5026188, at *6, the Court concludes that their absence prevents PRJA from claiming the sovereign immunity afforded municipal corporations.

> **a.    The General Assembly's Decision Not to Designate Regional Jails as Bodies Corporate or Political Subdivisions Weighs Heavily Against a Finding That PRJA Is a Municipal Corporation Entitled to Sovereign Immunity**

The Virginia General Assembly's decision not to designate regional jails as political subdivisions weighs heavily against a finding that PRJA is a municipal corporation.  The Assembly has made plain its position in two ways:  by declining to designate regional jail authorities as political subdivisions in enabling legislation, and by twice failing to enact bills that would have expressly afforded regional jails sovereign immunity.

First, deeming PRJA a municipal corporation would contradict the plain language of Va. Code Ann. § 53.1-95.7.  In determining whether an entity is a political subdivision, the Virginia Supreme Court has stated that a court must "confine [its] analysis . . . to the language of the relevant enabling legislation.  *Short Pump Town Ctr. Cmty. Dev. Auth. v. Hahn*, 554 S.E.2d 441, 447 (Va. 2001).  As the Virginia Supreme Court has stated, an entity should be recognized as a municipal corporation if "it appears that the legislature intended that they should be so construed."  *York*, 235 Va. at 480 (quoting *Hampton Rds.*, 68 S.E.2d at 499).  In Virginia, as a matter of statutory interpretation, it is well-settled that "the General Assembly clearly knows

---

[17] While PRJA argues that the Supreme Court of Virginia has never utilized this "most intrinsic" attribute language, that does not prevent this Court from finding such reasoning sound. *Heywood*, 2015 WL 5026188, at *6.

how to denominate an authority as a 'political subdivision' when it wishes to do so." *Hahn*, 554 S.E.2d at 447; *see also Thornhill*, 2017 WL 2304225, at *4.

Va. Code Ann. § 53.1-95.7, the statute authorizing the creation of regional jail authorities, is unambiguous: the General Assembly chose *not* to denominate regional jail authorities as political subdivisions. *See* VA. CODE ANN. § 53.1-95.7. Although the enabling legislation lists thirteen powers and attributes of regional jail authorities, it does not designate them as political subdivisions of the Commonwealth. *See* VA. CODE ANN. § 53.1-95.7; *Heywood*, 2015 WL 5026188, at *6.

The Court cannot alter the plain meaning of that statute and infer that the Assembly meant to treat regional jail authorities as political subdivisions. *See Campbell v. Harmon*, 628 S.E.2d 308, 312 (Va. 2006) (Where a "statute's text is clear and unambiguous, courts may not interpret them in a way that amounts to a holding that the legislature did not mean what it actually has expressed" (internal quotations omitted)). Where the Virginia General Assembly easily could have vested regional jails with an identifiable marker of a municipal corporation but did not, the Court may reasonably infer that the General Assembly meant "what it actually has expressed" and that regional jail authorities such as PRJA are not municipal corporations. *Id.* This Court, like the significant majority in this district, "declines to guess at the General Assembly's intentions in not designating jail authorities as a political subdivision," *Thrower*, 2019 U.S. Dist. LEXIS 230870, at *14, but finds the absence of such a designation significant.[18]

---

[18] In *Dowdy*, another federal district court in this district found that PRJA was a municipal corporation despite lacking political subdivision status. The *Dowdy* Court acknowledged that PRJA was not a political subdivision but found that "[w]hile Virginia law does not designate a jail authority as a political subdivision, for all intents an authority runs a jail the same way a city, county, or town would." *Dowdy*, 2014 WL 2002227, at *3. This approach however may run counter to the Virginia Supreme Court's direction in *Hahn* that a court must "confine [its] analysis . . . to the language of the relevant enabling legislation." 554 S.E.2d at

Second, in both the 2014 and 2015 legislative sessions of the Virginia General Assembly, lawmakers introduced bills with the purpose of granting sovereign immunity to regional jail authorities. *See* H.B. 150, Gen. Assemb., Reg. Sess. (Va. 2014); H.B. 1513, Gen. Assemb., Reg. Sess. (Va. 2015). In both sessions, the bills were not enacted. As the *Thornhill* Court observed, the "introduction of a bill that would shield regional jail authorities with sovereign immunity is a clear indication that the Virginia General Assembly is aware that regional jail authorities do not possess sufficient attributes of a municipal corporation to be vested with sovereign immunity under Virginia law." 2017 WL 2304225, at *4. This Court cannot amend Va. Code Ann. § 53.1-95.7 to provide for sovereign immunity where the General Assembly has expressly chosen not to. *See Va. Transit Co. v. Tidd*, 73 S.E.2d 405, 409 (Va. 1952) ("It is not the function of the court to legislate or to use the office of construction to amend plain statutes.").

Although not necessarily determinative of PRJA's claim of sovereign immunity, the Virginia General Assembly's decision not to vest regional jail authorities as political subdivisions likely forecloses its claim to status as a municipal corporation. In sum, the absence of a designation as a political subdivision coupled with failed attempts to pass legislation granting sovereign immunity weighs heavily against PRJA's status as a municipal corporation.

> **b.  PRJA's Lack of the Uniquely Governmental Power of Eminent Domain Weighs Heavily Against a Finding that PRJA Is a Municipal Corporation Entitled to Sovereign Immunity**

PRJA, like other regional jails, lacks the power of eminent domain, which also weighs strongly against finding that PRJA is a municipal corporation entitled to sovereign immunity.

---

447; *see also Costine,* 2019 WL 2775491, at *6 (finding *Dowdy* persuasive on the matter of sovereign immunity for regional jail authorities). Without a statement in a regional jail's enabling legislation, the Court cannot venture outside of the text and accord political subdivision status to a regional jail authority.

Without the governmental power of eminent domain or political subdivision status, there is little to separate the attributes PRJA does have from those found in fully private jails.

The Virginia Supreme Court has observed that the "power of eminent domain is a most important incident of the power of a sovereign." *Light v. City of Danville*, 190 S.E. 276, 281 (Va. 1937). Despite this, PRJA argues that its lack of the power of eminent domain is less significant because although "regional jails do not themselves have the power of eminent domain, 'all of the member localities have the power of eminent domain and could provide any needed facilities to the jail authority.'" (Mem. Supp. PRJA Mot. Dismiss 9 (quoting *Haleem*, 2017 WL 4400767, at *6).) Under this approach, although PRJA "may not have [the] direct power" of eminent domain, it has the indirect power of eminent domain because other sovereigns could exercise that power on its behalf. *Haleem*, 2017 WL 4400767, at *6. As the *Haleem* Court reasoned, "all of the member localities have the power of eminent domain and could provide any needed facilities to the jail authority." *Id.*

This contention does not persuade. In Virginia, eminent domain is a uniquely governmental power. The Virginia Supreme Court has cautioned that the "power of eminent domain can never be exercised 'except for public use,' and, even then, that power can only be exercised to the extent 'necessary to achieve the stated public use.'" *AGCS Marine Ins. Co. v. Arlington Cnty.*, 800 S.E.2d 159, 164 (Va. 2017) (quoting VA. CONST. ART. I, § 11). Like an entity's status as a body corporate or political subdivision of the Commonwealth, "the power of eminent domain is 'exclusively vested in, and conferred by Virginia's legislature.'" *McCaffrey*, 2019 WL 5445752, at *8 (quoting *Heywood*, 2015 WL 5026188, at *7). Considering this unique government function and source of power, other federal courts in the Eastern District of Virginia

have observed that the "power of eminent domain is a hallmark feature of a municipal corporation." *Thornhill*, 2017 WL 2304225, at *3.

PRJA lacks this "hallmark feature of a municipal corporation." *Id.* Without the power of eminent domain, nothing separates the attributes PRJA does enjoy from those attributes also found in private jails. As the *Heywood* Court noted, "[f]ully private jails [also] have the power to sue and be sued, to enter into contracts, to hold and dispose of real and personal property, to borrow money and issue bonds, and to manage their affairs by a board of directors." 2015 WL 5026188, at *6. So while PRJA *might* be able to persuade member localities to exercise the power of eminent domain on its behalf, the absence of the power of eminent domain still matters. It demonstrates that PRJA, and other regional jail authorities, lack a "hallmark feature of a municipal corporation." *Thornhill*, 2017 WL 2304225, at *3.

Furthermore, PRJA's argument, borrowed from *Haleem*, that its incorporating municipalities could exercise their power of eminent domain on PRJA's behalf would undermine the *Hampton Roads* framework. The Court cannot assume that an entity such as PRJA has an attribute purely because a municipality could potentially exercise that attribute on PRJA's behalf. Under that approach, PRJA could lack numerous attributes under the *Hampton Roads* framework, such as the power "to sue and be sued, to enter into contracts," the power of "eminent domain," and the power "to borrow money and issue bonds which are tax exempt," but could still be deemed a municipal corporation because its surrounding municipalities have that power. *Richmond Metro. Auth.*, 172 S.E.2d at 832 (quoting *Hampton Rds.*, 68 S.E.2d at 500). This seemingly transitive power of attributes does not carry the day. Several of the six attributes laid out by the Virginia Supreme Court as "pertinent" to determining whether an entity is a municipal corporation would lose their analytical value as a municipality could always exercise

35

that attribute on behalf of the corporation.  *York Cnty.*, 369 S.E.2d at 666.  Moreover, PRJA has

no legal input into a municipality's decision to invoke a particular attribute on its behalf.

PRJA therefore lacks a second, key defining feature of a municipal corporation—the

power of eminent domain.  As with political subdivision status, the Court cannot infer that PRJA

has this uniquely governmental power by its proximity to the municipalities that created it.

**c.      PRJA Lacks Two of the Most Important Attributes of Municipal Corporations**

The Court concludes that PRJA, like other regional jail authorities, lacks "the two

attributes . . . most intrinsic to municipal corporations[:]" designation as a political subdivision of

the Commonwealth and the power of eminent domain.  *See Heywood*, 2015 WL 5026188, at *6;

*see also Wright*, 2020 WL 1055665, at *13 (adopting *Heywood*'s reasoning and finding that a

regional jail authority's "lack of these two essential attributes . . . counsels against treating it as a

municipal corporation"); *McCaffrey*, 2019 WL 5445752, at *8 (adopting *Heywood*'s reasoning

that designation as a political subdivision and the power of eminent domain are the attributes

"most intrinsic" to municipal corporations); *Finamore*, 95 Va. Cir. at 41 (adopting *Heywood*'s

reasoning).

The Virginia General Assembly has chosen not to designate regional jail authorities as

political subdivisions.  Without designation as a political subdivision or the governmental power

of eminent domain, the Court finds that the first step of the two-step *Hampton Roads* inquiry

weighs against finding PRJA functions as a municipal corporation.

**2.      Second Prong:  PRJA Is Undertaking a Governmental Function But Seeks Designation as a Municipal Corporation Regarding a Point of Substantive Law**

Considering the second prong articulated by the Virginia Supreme Court, the Court must

look at the purpose for which PRJA "is seeking to be treated as a municipal corporation."

36

*Heywood*, 2015 WL 5026188, at *6 (citing *VEPCO*, 225 S.E.2d at 367). This factor weighs both for and against a finding that PRJA is a municipal corporation.

On the one hand, the Virginia Supreme Court has held that operating a jail constitutes a governmental function, *see Franklin v. Town of Richlands*, 170 S.E. 718, 719 (Va. 1933), and numerous federal district courts have cited *Franklin* in finding the same. *See, e.g.*, *McCaffrey*, 2019 WL 5445752, at *5 (accord); *Dowdy*, 2014 WL 2002227, at *3 (accord regarding PRJA). PRJA was unquestionably carrying out this governmental function when Sams was detained there between August 23, 2018 and September 15, 2018.

On the other hand, the Virginia Supreme Court has stated that an entity is more likely to be treated as a municipal corporation when "the pivotal point is one of procedure," rather than when "a point of substantive law is involved." *VEPCO*, 225 S.E.2d at 367. In this case, the "pivotal point" that PRJA seeks recognition as a municipal corporation is sovereign immunity: whether PRJA and its employees may be subject to suit. *Id*. As the *Heywood* Court stated, there can be no question that "the application of the doctrine of sovereign immunity [which] protects municipalities from tort liability involves a question of substantive law." *Heywood*, 2015 WL 5026188, at *7 (internal citations and quotations omitted).

Therefore, the purpose for which PRJA "is seeking to be treated as a municipal corporation" weighs both for and against a finding that PRJA is a municipal corporation. *Heywood*, 2015 WL 5026188, at *6 (citing *VEPCO*, 225 S.E.2d at 367). While PRJA exercises a governmental function in operating a jail, it seeks to avoid liability for a substantive tort claim, thus rendering it "less likely that the entity will be declared a municipal corporation." *VEPCO*, 225 S.E.2d at 367.

**3.**    **The Court Determines That Regional Jail Authorities Such as PRJA Are Not Municipal Corporations Entitled to Sovereign Immunity Against Tort Claims**

Using the two-step *Hampton Roads* test, the Court concludes that regional jail authorities such as PRJA are not entitled to sovereign immunity for tort claims as municipal corporations. The Court finds that the absence of the two key attributes of municipal corporations— designation by the Virginia General Assembly as "as a body corporate and politic and as a political subdivision of the Commonwealth" and "the power of eminent domain"—proves fatal to PRJA's claim to sovereign immunity. *Richmond Metro. Auth*., 172 S.E.2d at 832 (citing *Hampton Rds*., 68 S.E.2d at 500.) In so finding, the Court agrees with the clear majority of federal courts in Virginia that regional jail authorities are not municipal corporations that enjoy sovereign immunity from substantive tort claims. Prior to today, thirteen federal district courts in the Eastern and Western Districts of Virginia considered the issue, and nine concluded that regional jail authorities are not municipal corporations entitled to sovereign immunity from tort claims from prisoners.

Because PRJA and its employees are not entitled to sovereign immunity, the Court turns now to Sams's claims of Deliberate Indifference against the eight Individual Defendants: Harris, Kelske, Cumbo, Murrell, Robinson, Turner, Key, and Stith, finding that Sams states a claim for deliberate indifference against Harris, Kelske, Robinson, and Turner.

## V.  Count III:  Deliberate Indifference

The Court begins with Sams's deliberate indifference claims in violation of the Eighth and Fourteenth Amendment, brought pursuant to 42 U.S.C. § 1983. The Court finds that Sams has stated a deliberate indifference claim against Defendants Harris, Kelske, Robinson and Turner but not Defendants Cumbo, Murrell, Key, or Stith.

A.    **Legal Standard:  Deliberate Indifference in Provision of Medical Care**

The Eighth Amendment imposes a duty on prison officials to "provide humane

conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter,

and medical care."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  "To that end, a prison

official's deliberate indifference to serious medical needs of prisoners constitutes the

unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Scinto v.

Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal quotation marks and citation omitted).

To make out an Eighth or Fourteenth Amendment claim,[19] a detainee must allege facts

that indicate "(1) that *objectively* the deprivation suffered or harm inflicted was 'sufficiently

---

[19] Because Sams was a pretrial detainee in a Virginia facility at the time of her injury, she
brings her § 1983 claim pursuant to the Fourteenth Amendment to the United States Constitution
and not the Eighth Amendment, as she would if she were convicted and serving a prison
sentence.  Regardless, the Court applies the same standard of review to Sams's deliberate
indifference claims as it would under the Eighth Amendment.  Other courts in the Eastern
District of Virginia have recognized that "[t]he Fourth Circuit has confirmed the correlation
between the Eighth Amendment deliberate indifference standard and Fourteenth Amendment
deliberate indifference claims." *Reid v. Newton*, No. 3:13cv572, 2014 WL 1493569, at *5 (E.D.
Va. Apr. 14, 2014) (internal citations omitted).  For instance, in *Brown v. Harris*, the Fourth
Circuit declined to determine whether a decedent was a pretrial detainee or prisoner—thus
necessitating a choice between applying the Fourteenth Amendment or Eighth Amendment—as
the "standard in either case is the same." 240 F.3d 383, 388 (4th Cir. 2001).  Similarly, in
*Parrish ex. rel. Lee v. Cleveland*, the Fourth Circuit stated that the Fourteenth Amendment
deliberate indifference "standard is the same as that which applies in cases arising under the
Eighth Amendment." 372 F.3d 294, 302 n.11 (4th Cir. 2004).
Sams argues that the United States Supreme Court "recently suggested that pretrial
detainees receive more protection than convicted prisoners" and "held that 'an objective standard
is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to
the Fourteenth Amendment.'"  (Resp. Murrell Mot. Dismiss 9 n.4, ECF No. 43 (quoting *Kingsley
v. Hendrickson*, 135 S. Ct. 2466, 2476 (2015))).  Sams also argues that "the Supreme Court never
applied the deliberate indifference standard from *Farmer* to denial of medical care claims by
pretrial detainees."  (*Id.*)  The Court acknowledges a split of authority on this issue since
*Kingsley* was decided, with several circuits applying Sams's suggested objective standard while
others have confined the holding in *Kingsley* to excessive force cases.  *See Antonio v. Bd. of
Cnty. Comm'rs for Cnty. of Cibola*, No. 19cv572, 2020 WL 5232392, at *5 (D.N.M. Sept. 2,
2020) (outlining circuit split).  At this juncture, absent a Fourth Circuit decision applying
*Kingsley* to medical deliberate indifference claims, the Court will continue to apply well-settled

serious,' and (2) that *subjectively* the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)) (emphasis added).

Under the objective prong, the inmate must allege facts that suggest that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "In order to demonstrate such an extreme deprivation, a prisoner must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions.'" *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler*, 989 F.2d at 1381).

The objective prong of a medical deliberate indifference test "requires plaintiffs to demonstrate officials' deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal quotations and citation omitted).  In the context of a medical care delay, the plaintiff also must establish that "the delay in the provision of medical care 'resulted in substantial harm.'" *Johnson v. Boakye*, No. 3:15cv54, 2016 WL 5030367, at *3 (E.D. Va. Sept. 19, 2016) (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

The subjective prong of a deliberate indifference claim requires the plaintiff to allege facts that indicate a particular defendant actually knew of and disregarded a substantial risk of

---

Fourth Circuit precedent on this matter.  Either way, the Court notes the difference between standards of review is of no moment to this decision:  applying an objective rather than a subjective test would not determinatively sway the Court's analysis as to any of the defendants below.

serious harm to his or her person.  *See Farmer*, 511 U.S. at 837; *see also Scinto*, 841 F.3d at 226 (the plaintiff must show "the official's actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction") (internal quotation marks and citation omitted).  "A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Scinto*, 841 F.3d at 226 (internal citations and quotations omitted).  A prison official's "failure to respond to an inmate's known medical needs raises an inference of deliberate indifference to those needs."  *Id*. (internal quotations and alterations omitted).

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."  *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle*, 429 U.S. at 105–06).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.

*Farmer*, 511 U.S. at 837.  *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough.  The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate."  *Johnson*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 340 (4th Cir. 1997)).  Thus, to survive a motion to dismiss, the deliberate indifference standard requires a plaintiff to assert facts sufficient to form an inference that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his [or her] actions

were 'inappropriate in light of that risk.'"  *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing.  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim. *See Wright*, 766 F.2d at 849 (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### B.    Sams Has Satisfied the Objective Prong of the Deliberate Indifference Test

The Court finds, for the purposes of the Motions to Dismiss, that Sams has satisfied the objective prong of the deliberate indifference test:  she had a "'serious' medical need that ha[d] either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Scinto*, 841 F.3d at 225.

Reading the facts in the light most favorable to Sams, her consistent pleas for help and complaints about headaches, nausea, hot and cold flashes, head pressure, and inability to hold down food show a "medical need . . . so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.*; *see, e.g., Tharrington v. Commonwealth*, No. 7:17cv00090, 2018 WL 4515899, at *8 (W.D. Va. Sept. 20, 2018) (finding prisoner's repeated complaints of "severe pain related to surgery, falls, and other health issues . . . satisfies the objective prong because he plausibly alleges that his pain qualifies as objectively serious"). Furthermore, where Sams relies on the delay in providing her medical care, she has plausibly established that the delay "resulted in substantial harm," *Boakye*, 2016 WL 5030367, at *3 (quoting *Mata*, 427 F.3d at 751), as she alleges the delay in obtaining medical treatment caused

her to suffer a stroke leading to "significant speech, motor, and cognition difficulties . . . . [that] will remain with her for the rest of her life[.]"  (Compl. ¶ 81).

Because Sams readily satisfies the objective prong of a deliberate indifference claim, the Court turns to whether Sams has met the subjective prong of the deliberate indifference test against each individual defendant.

### C.    The Subjective Prong:  The Armor Defendants

The Court determines that Sams has stated a claim for deliberate indifference against Harris and Kelske but not Cumbo and Murrell.

#### 1.    Nurse Practitioner Harris

Sams has stated a claim for deliberate indifference against Nurse Practitioner Harris in her individual capacity.

##### a.    Factual Allegations Relating to Nurse Practitioner Harris

On September 11, 2018, Sams made her first request for medical assistance stating that she had been suffering from "'three days of headache' and imploring, '**so sick please help**.'" (Compl. ¶ 28.)  The medical record shows that ARNP Harris entered "a verbal order" for "Tylenol 500 mg. and Zofran (nausea and vomiting medication) 4 mg. stat . . . [b]ut there is no record indicating that Harris examined . . . Sams." (*Id.* ¶ 29.)

The next day, on September 12, 2018, Armor medical personnel saw Sams again.  Nurse Cumbo noted that Sams "'states that she has **nausea x 2, HA** [headache] **x 4 days with pressures in both ears and facial pain with hot and cold flashes**.'"  (*Id.* ¶ 34.)  LPN Cumbo wrote that "'Information [was] given'" to Harris but "there is no record indicating that Harris . . . or any other nurse practitioner or physician saw . . . Sams that day or the next."  (*Id.*)

On September 14, 2018, three days after Sams's first request for help and six days after Sams first experienced symptoms, ARNP Harris saw Sams for the first time. Despite noting that Sams still experienced "**<u>continued headache x 4 days</u> with associated nausea and vomiting**," (*id.* ¶ 41), and had "**difficulty holding down any food or liquid at this time**," (*id.*), Nurse Practitioner Harris "simply directed or caused . . . Sams to be returned to . . . Sams's jail housing unit" without "having made a determination as to the cause of . . . Sams's ongoing serious condition or elevating . . . Sams to a higher level of care." (*Id.* ¶¶ 42–43.) Harris instead "gave . . . Sams a routine pain medication (Ibuprofen) and a nausea/vomiting medication (Promethazine)." (*Id.* ¶ 42.)

> **b.    Sams States a Claim for Deliberate Indifference as to Nurse Practitioner Harris Due to the Delay in Treatment and Inadequacy of Care**

The facts as alleged regarding Nurse Practitioner Harris's conduct, taken as true and read in the light most favorable to Sams, plausibly show that Harris "subjectively recognized a substantial risk of harm" to Sams and "subjectively recognized that [her] actions were 'inappropriate in light of that risk.'" *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2). Sams therefore meets the subjective prong of a deliberate indifference claim. *Farmer*, 511 U.S. at 837. Specifically, ARNP Harris's actions plausibly reflect a "failure to respond to an inmate's known medical needs" and thereby "raises an inference of deliberate indifference to those needs." *Scinto*, 841 F.3d at 226.

The Fourth Circuit has stated that "[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (internal citation and quotations omitted); *see also Estelle*, 429 U.S. at 105 (holding that deliberate indifference may be

demonstrated by "intentionally denying or delaying access to medical care").  As to adequacy of care, a "prisoner can establish a claim of deliberate indifference 'by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment.'"  *King v. United States*, 536 F. App'x 358, 362 (4th Cir. 2013) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).  This standard can be satisfied "'when the need for treatment is obvious'" yet prison officials merely provide 'medical care which is so cursory as to amount to no treatment at all.'"  *Id.* (quoting *McElligott*, 182 F.3d at 1255).

Here, Nurse Practitioner Harris was responsible for supervising other Armor medical staff, (Compl. ¶ 18), including Nurses Cumbo and Murrell, (*id.* 13 n.3).  On September 11, 2018, Harris, after learning about Sams's "'three days of headache'" and request "'**so sick please help**,'" took no action except to prescribe pain medication to Sams without examination.  (*Id.* ¶ 28.)  The next day, on September 12, 2018, Nurse Cumbo recorded Sams's reports of nausea, headaches, head pressure, and hot and cold flashes and gave that information to Nurse Practitioner Harris.  But Harris allegedly took no action.  (*Id.* ¶ 34.)  Finally, on September 14, 2018, once Harris saw Sams in person, two days after LPN Cumbo's report and six days after Sams's first reported symptoms, she took no action but "simply directed or caused . . . Sams to be returned to . . . Sams's jail housing unit" and prescribed additional pain medication—pain medication that had been shown not to have improved Sams's condition over the previous week.  (*Id.* ¶ 42.)

Harris's actions, as stated in the Complaint, plausibly reflect a "failure to respond to an inmate's known medical needs" and thereby "raises an inference of deliberate indifference to those needs."  *Scinto*, 841 F.3d at 226.  Notably, Harris did not see Sams until six days after she first reported symptoms of serious medical distress.  This allegedly unjustified delay in providing

treatment, in the face of Sams's repeated requests for medical assistance and the apparent seriousness of her condition, "exacerbated [Sams's] injury" by causing her to suffer a stroke and "unnecessarily prolonged [her] pain." *Formica*, 739 F. App'x at 755; *see also Harris v. Virginia*, No. 3:07cv701, 2008 WL 4145923, at *5 (E.D. Va. Sept. 8, 2008) (finding sufficient allegations of deliberate indifference where nurse noticed bump on prisoner's wrist but delayed scheduling an x-ray for nine days, exacerbating the injury to the prisoner's fractured wrist); *Mata*, 427 F.3d at 751 (finding triable issue of fact for deliberate indifference claim when nurse who was aware of prisoner's "unexplained severe chest pain" failed to elevate or otherwise address that unexplained pain leading to the prisoner suffering a heart attack with irreversible damage).

Furthermore, according to the Complaint, once Harris saw Sams, she failed to make a "determination as to the cause of . . . Sams's ongoing serious condition," (*id*. ¶ 43), and only prescribed her pain medication that had "not previously effectively resolved . . . Sams's serious and worsening condition," (*id* ¶ 42). This decision to take "an easier but less efficacious course of treatment" plausibly shows that Harris provided "grossly inadequate care." *King*, 536 F. App'x at 362 (quoting *McElligott*, 182 F.3d at 1255); *Mitchell*, 327 F. Supp. 2d at 658 (finding triable issue of fact in deliberate indifference claim where doctor, with knowledge of potential serious condition in patient, returned that patient to a crowded jail cell without treatment).

The United States Court of Appeals for the Eleventh Circuit's decision in *McElligott* is instructive here. In that case, a prisoner repeatedly requested medical help for stomach pain, but the treating medical practitioners prescribed only pain and anti-gas medication. *McElligott*, 182 F.3d at 1252–54. After several months of insufficient treatment, the prisoner was diagnosed with terminal stomach cancer. *Id*. at 1254. The Eleventh Circuit reversed the district court's grant of summary judgment to the defendant medical practitioners, finding "that the medication provided

46

to [plaintiff] was so cursory as to amount to no care at all." *Id*. at 1257.  The *McElligott* Court determined that "a jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [plaintiff's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff's] condition." *Id*.  (internal citations omitted).  Here too, although the delay in treatment was not as lengthy as in *McElligott*, at this procedural posture, the Court may infer deliberate indifference on a motion to dismiss from the allegations that Harris knew of the extent of Sams's pain, knew that the prescribed course of pain medication was "largely ineffective," and "declined to do anything more" except to prescribe additional pain medication.  *Id*. (internal citations omitted).

The Court determines that, reading the Complaint in the most favorable light, Sams has sufficiently alleged that Nurse Practitioner Harris knew of and disregarded a substantial risk of serious harm to Sams.  Sams has thus stated a claim for deliberate indifference against ARNP Harris, and the Court will deny the Armor Individual Defendants Motion to Dismiss as to the deliberate indifference claim against her.

### 2.   **EMT-B Kelske**

The Court determines that Sams has stated a claim for deliberate indifference against EMT Kelske in her individual capacity.

#### a.   **Factual Allegations Relating to EMT Kelske**

On September 12, 2018, Sams made her third request for medical assistance through PRJA's operating system.  (Compl. ¶ 32.)  Sams wrote:

> **My headache isnstill really bad n I still feel sick n cant eat . . . im still really bad n know im running a fever . . . get cold than burning up..whole face swallon n hurts, I feel like my ears are going to explode, please help asap,** Tylenol helps some but **im hurting soo bad**

(*Id.*)  In response, at 11:52 a.m., Kelske wrote "you are on Tylenol.  We do not dispense any other pain medication."  (*Id.* ¶ 33.)  Kelske did not otherwise respond to or acknowledge Sams's expressed symptoms and marked Sams's Medical Sick Call Request "'**Closed**.'"  (*Id.*)

On September 12, 2018, at about 3:13 p.m., shortly after being returned to her cell from her first visit to Medical, Sams made another Medical Sick Call Request.  (*Id.* ¶ 35.) Sams wrote:

> **Im still sick worse then yesterday/late lastnight**. I was given medication For nauseua may I request more please. I was given aspirin it seems to totally mess my stomach up worst then ever **im not better and** <u>**pledding mercy for more help**</u> Thank you

(*Id.*)  Kelske wrote in response to Sams, "'you were also prescribed medication for nausea and vomiting.'"  (*Id.* ¶ 36.)  Shortly thereafter, Kelske "marked . . . Sams's recent Medical Sick Call [R]equest as '**Closed**.'"  (*Id.*)  "There is no record indicating that Kelske, or any other medical care provider, saw . . . Sams in response to this request."  (*Id.*)

### b. Sams States a Claim for Deliberate Indifference as to EMT Kelske Due to the Inadequacy of Care

The facts as alleged regarding EMT Kelske's conduct, taken as true and read in the light most favorable to Sams, plausibly show that Kelske "subjectively recognized a substantial risk of harm" to Sams and "subjectively recognized that [her] actions were 'inappropriate in light of that risk.'"  *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).  Sams therefore meets the subjective prong of a deliberate indifference claim against Kelske.  *Farmer*, 511 U.S. at 837. As with Nurse Practitioner Harris, EMT Kelske's alleged failure to address Sams's pleas for help plausibly reflects a "failure to respond to an inmate's known medical needs" and thereby "raises an inference of deliberate indifference to those needs."  *Scinto*, 841 F.3d at 226.

Kelske, as an EMT, "[p]erforms initial assessment and management of illness or injury" and "[p]rovides direct paramedical and comprehensive patient care, as required in each individual case." (Compl. ¶ 19.)  Here, Sams alleges that she informed Kelske on the morning of September 12, 2018 that she was experiencing serious systems of medical distress, including that she was "**sick**," could not "**eat**," that she was "**burning up**" that her whole face and swallowing "**hurts**," that she felt like her ears were "**going to explode**." (*Id*. ¶ 32.)  This was the second of four requests for medical help Sams made on September 12, 2018.  Sams stated "please help asap." (*Id*.)  In response, Kelske replied "'you are on Tylenol.  We do not dispense any other pain medication." (*Id*. ¶ 33.)  Later that day, during her third effort to get treatment, Sams again informed Kelske that she was "worse" and that she was "**pledding [for] mercy**." (*Id*. ¶ 35.)  Kelske again informed Sams that she was already on prescribed medication. (*Id*. ¶ 36.)  In both cases, Kelske marked Sams's Medical Sick Call Request as "'**Closed**.'" (*Id*. ¶¶ 33, 36.)

These facts, taken as true, plausibly show that Kelske failed "to respond to [Sams's] known medical needs" thereby "rais[ing] an inference of deliberate indifference to those needs." *Scinto*, 841 F.3d at 226.  The facts as alleged in the Complaint closely parallel those in *Scinto* where the Fourth Circuit found a triable issue of deliberate indifference when a prisoner made a medical sick call because he was covered in blood and "exhibited visible signs of illness" but the responding doctor "simply looked at plaintiff in disgust and turned his head and started to walk away, providing no medical aid." *Id*. at 231–32 (internal quotations and alterations omitted).  Under these facts, one can "infer deliberate indifference from the fact that [Kelske] knew the extent of [Sams's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [Sams's] condition." *McElligott*, 182 F.3d at 1257.

Furthermore, Sams's allegation that Kelske "'**Closed**'" both of Sams's Medical Sick Call Requests further bolsters her deliberate indifference claim.  (Compl. ¶¶ 33, 36.)  While EMT Kelske did not respond to Sams's symptoms, her additional act of closing Sams's requests for medical assistance plausibly ensured that other medical personnel at the jail would not address Sams's escalating condition but view it as resolved.  *See Nelson v. Hill*, No. 3:08cv603, 2010 WL 1005320, at *3 (E.D. Va. Mar. 17, 2010) (finding triable issue of deliberate indifference when a medical superintendent knew of prisoner's "serious need to be seen by a physician and simply disregarded that need," but failed to take action to ensure that the prisoner was seen by a doctor despite a promise to schedule the appointment).

The Court concludes after reading Sams's Complaint in the most favorable light, she has sufficiently alleged that Kelske knew of and disregarded a substantial risk of serious harm to Sams.  Sams has thus stated a claim for deliberate indifference against Kelske.  The Court will deny the Armor Individual Defendants Motion to Dismiss as to the deliberate indifference claim against Kelske.

### 3.  <u>Nurse Cumbo</u>

The Court determines that Sams has not stated a claim for deliberate indifference against Cumbo in her individual capacity.

#### a.  <u>Factual Allegations Relating to Nurse Cumbo</u>

The factual allegations relating to Nurse Cumbo involve Sams's visit to Medical on September 12, 2018.  On that day, Cumbo saw Sams and noted that Sams "'states that she has **nausea x 2, HA** [headache] **x 4 days with pressures in both ears and facial pain with hot and cold flashes**.'"  (Compl. ¶ 34.)  LPN Cumbo wrote that "'Information [was] given'" to Harris. (*Id.*)  Sams alleges, however, that "[t]here is no record indicating that Harris or any other nurse

practitioner or physician saw . . . Sams that day or the next." (*Id.*)  Sams states that "the records

indicate that an LPN (Cumbo) saw . . . Sams without supervision" and there exists "no record of

any treatment provided to . . . Sams at this time." (*Id.*)  "Records indicate that . . . Sams was

simply returned to her cell." (*Id.*)

> **b.      Sams Does Not State a Claim for Deliberate Indifference as to
> EMT Cumbo Because the Allegations Do Not Show Nurse
> Cumbo Subjectively Realized Her Actions in Response to
> Sams's Symptoms Were Inappropriate**

The facts alleged regarding LPN Cumbo do not plausibly rise to the level of deliberate

indifference.  To meet the subjective prong of a medical deliberate indifference claim, a plaintiff

must assert facts sufficient to form an inference that "the official in question subjectively

recognized a substantial risk of harm" and "that the official in question subjectively recognized

that his [or her] actions were 'inappropriate in light of that risk.'"  *Cleveland*, 372 F.3d at 303

(quoting *Rich*, 129 F.3d at 340 n.2).  Here, Sams cannot show that Cumbo "subjectively

recognized that [her] actions were 'inappropriate in light of th[e] risk'" facing Sams.  *Id.*

The facts in the Complaint demonstrate that Nurse Cumbo saw Sams and reported

information about Sams's symptoms to Nurse Practitioner Harris—her supervisor.

(Compl. ¶¶ 18, 34.)  Importantly, Sams seems to allege that Nurse Cumbo was not permitted, by

Virginia law, to take further action.  Sams states that LPNs such as Cumbo are "not permitted in

Virginia to independently assess patients or render a nursing diagnosis or nursing opinion of a

patient's symptoms and potential problems a patient may face."  (Compl. 13 n.3.)  "LPNs must

always act under the supervision and direction of a registered nurse (RN) (who can make such an

assessment) or a physician/ nurse practitioner (who has a wider scope of practice and can

actually medically diagnose as well)."  (*Id.*)  In the Complaint, Sams references 18 Va. Admin.

Code § 90-19-70, which states that "[l]icensed practical nursing shall be performed under the

direction or supervision of a licensed medical practitioner, a registered nurse, or a licensed dentist." 18 VA. ADMIN. CODE § 90-19-70.

Sams asserts that Nurse Cumbo was an "official who serve[d] 'as a gatekeeper for other medical personnel capable of treating the condition.'" *Nelson*, 2010 WL 1005320, at *3 (quoting *Mata*, 427 F.3d at 751). While a gatekeeper such as LPN Cumbo "may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role,'" *id*. (quoting *Mata*, 427 F.3d at 751), the allegations in the Complaint reflect that Cumbo reported information to Nurse Practioner Harris about Sams's condition, (Compl. ¶ 34). Given Cumbo's limited role, her actions in reporting Sams's symptoms to her superior for further diagnosis and treatment were not "inappropriate in light of [the] risk" facing Sams, the protocol Armor personnel were expected to follow, or Virginia regulations. *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2); *see also Tharrington,* 2018 WL 4515899, at *10 (finding nurses were not deliberately indifferent when they "inform[ed] the treating doctor of the patient-inmate's condition" even though doctor did not treat or see patient in a timely manner); *Mata*, 427 F.3d at 760 (finding nurse had "fulfilled her gatekeeper duty" by faxing heart scan of prisoner to physician in accordance with Department of Correction protocol and thereafter instructing prisoner to return to her cell to change, at which time prisoner suffered heart attack).

No factual allegations in the Complaint regarding Cumbo's conduct exist beyond those regarding Sams's September 12, 2018 visit. Absent additional factual allegations, Sams has not shown that Cumbo "subjectively recognized that [her] actions were 'inappropriate in light of th[e] risk,'" facing Sams and has not met the subjective prong of a deliberate indifference claim. *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2). The Court will grant the Armor Individual Defendants Motion to Dismiss as to the deliberate indifference claim against Cumbo.

    **4.**    <u>**Nurse Murrell**</u>

The Court determines that Sams has not stated a claim for deliberate indifference against Nurse Murrell.

    **a.**    <u>**Factual Allegations Relating to Nurse Murrell**</u>

The factual allegations relating to Murrell involves the evening of September 14, 2018. On that evening at 8:00 p.m., Armor's medical records reflect that Murrell "dispensed Promethazine to . . . Sams." (Compl. ¶ 46.)  Sams avers that due to her "documented condition preceding, at the time of, and/or following Murrell's encounter with [Sams] indicates that Murrell, LPN learned of . . . Sams's abnormal and altered mental status condition and other signs and complaints of severe medical distress (headache, photophobia, nausea, and vomiting)." (*Id.*)

Despite this alleged knowledge, and Murrell's responsibility to ensure patients receive proper care, Sams avers that Nurse Murrell, "disregarded . . . Sams's condition." (*Id.*)  Murrell "did not notify a doctor or nurse practitioner, and she did not call 911 or otherwise cause . . . Sams to be transported to a hospital." (*Id.*)

    **b.**    **Sams Does Not State a Claim for Deliberate Indifference as to Murrell Because the Allegations Do Not Show that Nurse Murrell Subjectively Recognized a Substantial Risk of Harm to Sams or That Her Actions Were Inappropriate Even If She Had Appreciated That Risk**

The facts as alleged to Murrell do not meet the subjective prong of a deliberate indifference claim.  To meet the subjective prong of a medical deliberate indifference claim, a plaintiff must assert facts sufficient to form the now-familiar inference that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question

subjectively recognized that his [or her] actions were 'inappropriate in light of that risk.'" *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).  Sams has not pled facts showing that Nurse Murrell meets either *Cleveland* factor:  that she subjectively realized a substantial risk of harm or realized her actions were inappropriate in light of that risk.  *Id*.

First, Sams has not pled facts plausibly showing that Nurse Murrell "subjectively recognized a substantial risk of harm" could befall Sams.  *Id*.  The sole factual allegation relating to Murrell's conduct on the night of September 14, 2018 is that she dispensed medicine to Sams at 8:00 p.m.  (Compl. ¶ 46.)  While medical records at Memorial Regional stated that staff had observed Sams "**to be acting abnormal**" and "complaining of a [headache]" and various other symptoms on the night of September 14, 2018, (*id*. ¶ 44), the Complaint provides no basis to infer that LPN Murrell observed Sams's abnormal behavior or heard Sams' complaints when she dispensed the medication to Sams.  Sams alleges that it is reasonable to infer that Murrell obtained or should have obtained such knowledge due to Sams's "documented condition preceding, at the time of, and/or following Murrell's encounter with [Sams]."  (*Id*. ¶ 46.)  But this statement, rather than providing the basis for a reasonable inference deliberate indifference, does not make clear whether Sams's observable symptoms began "following" or "preceding" Murrell's interaction with her.  (*Id*.)

Without such factual allegations, Sams's statement that Murrell "learned of . . . Sams's abnormal and altered mental status condition and other signs and complaints of severe medical distress," (*id*.), resembles a "naked assertion[] of wrongdoing" which necessitates further "factual enhancement . . . to cross the line between possibility and plausibility of entitlement to relief."  *Francis*, 588 F.3d at 193; *see also Reid* 2014 WL 1493569, at *8 (plaintiff's statement that prison officials "'received or had actual or constructive knowledge of certain transfer

54

documents' is an unsupported legal conclusion").  The Complaint is devoid of further factual enhancement showing that Murrell had such knowledge.

Second, the allegations in the Complaint do not show that Murrell "subjectively recognized that [her] actions were 'inappropriate in light of th[e] risk'" facing Sams.  *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).  Even if Murrell were aware of some of Sams's symptoms, Murrell dispensed Promethazine, a nausea medication that had been prescribed to Sams by Nurse Practioner Harris.  (Compl. ¶¶ 42, 46.)  While Harris could have known that Promethazine was inadequate to treat Sams's condition, Sams does not allege that Murrell had treated or otherwise encountered Sams before dispensing medication to her.  Under these circumstances, the Complaint does not allege facts plausibly showing that Murrell subjectively knew that such medication would prove inadequate to address Sams's symptoms or complaints, even if some of those symptoms and complaints had been brought to her attention.

Sams has not alleged facts showing that Nurse Murrell "subjectively recognized a substantial risk of harm" to Sams when Murrell dispensed medication to Sams on the night of September 14, 2018.  *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).  Even if Murrell had subjectively realized a risk of harm, Sams has not alleged that LPN Murrell "subjectively recognized that [her] actions"—giving Sams the medication prescribed by her supervisor, Nurse Practitioner Harris—"were 'inappropriate in light of that risk.'"  *Id*. (quoting *Rich*, 129 F.3d at 340 n.2).  For those reasons, Sams has not satisfied the subjective prong of a deliberate indifference claim against Murrell.  The Court will grant the Murrell Motion to Dismiss as to the deliberate indifference claim against her.

### D.      The Subjective Prong:  The PRJA Defendants

The Court determines that Sams has stated a deliberate indifference claim against

Officers Robinson and Turner but not against Officers Key and Stith.

### 1.      Correctional Officers Robinson and Turner

Sams has stated a claim for deliberate indifference against Correctional Officers

Robinson and Turner in their individual capacities.

#### a.      Factual Allegations Relating to Correctional Officers Robinson and Turner

Sams's allegations against Correctional Officers Robinson and Turner focus on the night

of September 14, 2018.  Sams states, "upon information and belief," that Robinson and Turner

were the "staff" mentioned in the Memorial Regional medical records who "observed . . . [Sams]

**acting abnormal <u>since last night</u>**."  (Compl. ¶ 9.)  Sams avers that Officers Robinson and

Turner, who were assigned to "among other units . . . Sams's H Unit on the night shift for

September 14, 2018, [and] failed to provide . . . Sams with access to medical care despite her

abnormal, altered mental status and other obvious signs and complaints of severe medical

distress."  (Compl. ¶ 45.)  Sams alleges that Robinson and Turner "[c]ompletely ignored . . .

Sams's open and obvious acute medical condition," (*id*. ¶ 99), and she "continued to languish

[throughout the night] without intervention by Robinson or Turner," (*id*. ¶ 9).

#### b.      Sams Has Stated a Claim for Deliberate Indifference Against Correctional Officers Robinson and Turner Due to Their Failure to Obtain Medical Care for Sams During the Night of September 14, 2018

Sams has plausibly stated a claim for deliberate indifference against Correctional Officers

Robinson and Turner.  Sams alleges facts that, taken as true, show that Robinson and Turner

"subjectively recognized a substantial risk of harm" to Sams.  Sams further alleges both

56

Correctional Officers "subjectively recognized that [their] actions" in not seeking help for Sams was "'inappropriate in light of that risk.'" *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).

First, the Complaint includes facts that show Robinson and Turner "subjectively recognized a substantial risk of harm" to Sams. *Id.* Sams states, "upon information and belief,"[20] that Robinson and Turner were the "staff" members who noted Sams's "altered mental status," (Compl. ¶ 9), her "abnormal" behavior," and Sams's complaints "of a [headache] last night with associated photophobia [painful oversensitivity to light], nausea, and vomiting," (*id.* ¶ 44). They reported that Sams was putting mattresses **"on her cellmate and laying on top of them."** (*Id.*) Taken together, these symptoms and complaints demonstrate that Sams was in medical distress, and that Robinson and Turner, as the documenting "staff" members, recognized this distress. (*Id.* ¶ 9.) Because "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 843, the Complaint alleges that Robinson and Turner "subjectively recognized a substantial risk of harm" to Sams. *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).

Second, the Complaint provides facts showing that Correctional Officers Robinson and Turner "subjectively recognized that [their] actions" in not summoning help for Sams was "'inappropriate in light of'" Sams's condition. *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129

---

[20] Although Sams pleads this fact on information and belief, a "plaintiff is generally permitted to plead facts based on 'information and belief' if such plaintiff is in a position of uncertainty because the necessary evidence is controlled by the defendant." *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015). The Court finds Sams's claim that Correctional Officers Robinson and Turner were the "staff" who noted Sams's symptoms and altered mental status to be reasonable on this limited record where Robinson and Turner were responsible for supervising Sams's cell block on the night before her hospital admission. (Compl. ¶ 9.)

F.3d at 340 n.2).  During the night of September 14, 2018, Sams alleges she was showing signs of an altered mental state, acting abnormally, and complaining of serious medical symptoms. Where a prisoner is showing outward signs of serious medical distress, courts have found that even a brief delay in calling for medical assistance may constitute deliberate indifference.  *See Coats v. Pope*, No. 1:17cv02930, 2019 WL 5586871, at *7 (D.S.C. Oct. 30, 2019) (finding plaintiff had stated claim for deliberate indifference where correctional officers delayed forty-three minutes in calling for medical assistance where prisoner was "sweating and breathing heavily, vomiting, incapable of speaking, standing or walking, and having seizures"); *Mitchell*, 327 F. Supp. 2d at 652 (finding triable issue of deliberate indifference where prisoner was suffering from "heavy sweating, vomiting, incoheren[t], and [unable] to walk" but patrolling guards "took virtually no action in response").  Due to the apparent seriousness of Sams's condition, and the fact that Robinson and Turner allegedly took no action in response to her condition, the Court concludes that Sams has plausibly pled that Officers Robinson and Turner "subjectively recognized that [their] actions" in not summoning help for Sams was "'inappropriate in light of'" Sams's condition.  *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).

The Court determines that Sams has sufficiently alleged that Correctional Officers Robinson and Turner knew of and disregarded a substantial risk of serious harm to Sams.  Sams has thus stated a claim for deliberate indifference against Robinson and Turner, and the Court will deny the PRJA Individual Defendants Motion to Dismiss on that ground.

## 2. Correctional Officers Key and Stith

Sams has not stated a claim for deliberate indifference against Correctional Officers Key and Stith.

### a.     Factual Allegations Relating to Correctional Officers Key and Stith

Sams's factual allegations against Correctional Officers Key and Stith focus on the morning of September 15, 2018.  Sams states that records indicate that her "altered mental status that had begun the **previous evening** (**September 14**) had not abated, but continued throughout the night and into the morning of September 15, 2018."  (Compl. ¶ 48.)  On the morning of September 15, 2018, medical records further indicate that Sams's "'[**altered mental status**] **was noted by** [PJRA] **staff this morning <u>around 6:30 hrs</u>**.'"  (*Id.* ¶ 47.)

At about 8:43 a.m., "a nurse entered . . . Sams's unit 'to assist' an officer 'with inmate Sams.'"  (*Id.* ¶ 48.)  Sams alleges that Correctional Officers Key and Stith "who were specifically assigned to, among other units, . . . Sams's H Unit on the morning of September 15, 2018, long failed to provide . . . Sams with access to medical care, failing to call Medical until about 8:43 a.m."  (*Id.*)

### b.     Sams Has Not Alleged Facts Showing that Correctional Officers Key and Stith Subjectively Realized Their Actions in Response to Sams's Symptoms Were Inappropriate

Sams does not allege facts showing that Correctional Officers Key and Stith "subjectively recognized that [their] actions were 'inappropriate in light of th[e] risk'" facing Sams.  As a result, at this procedural stage, Sams does not plausibly show that they were deliberately indifferent to her medical needs.  *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2).

The Complaint states that Officers Key and Stith delayed in providing Sams access to medical care, "failing to call Medical until about 8:43 a.m."  (Compl. ¶ 48.)  Because "staff" noted Sams "altered mental status . . . around 6:30 [a.m.]," (*id.* ¶ 47), Sams argues that the "the more than two-hour delay between that observation and . . . Sams being sent down to Medical constitutes deliberate indifference."  (Resp. Opp. PRJA Mot. Dismiss 24, ECF No. 32.)  But the

Complaint contains no allegations about when Correctional Officers Key and Stith's shift began on the morning of September 15, 2018, when they became aware of Sams's condition, and the amount of time that elapsed between their knowledge of Sams's emergent condition and their call to Medical.  (*See generally* Compl. ¶¶ 47–49.)  While "staff" noted Sams's "'[**altered mental status**] . . . **around 6:30 hrs**,'" the Complaint does not allege that Officers Key and Stith became aware of Sams's condition until they called Medical at 8:43 a.m.  (*Id.* ¶ 47.)

Without any such factual allegations, the Court cannot conclude that Officers Key and Stith "subjectively recognized that [their] actions were 'inappropriate in light of th[e] risk'" facing Sams, *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2), especially when they requested medical assistance for Sams during their morning shift.  While even a short delay in providing medical care may constitute deliberate indifference, *Formica*, 739 F. App'x at 755, the facts as alleged do not plausibly show that Correctional Officers Key and Stith delayed in obtaining medical care for Sams.  Without factual allegations regarding when Key and Stith started their shift or when they learned of Sams's condition, the Court cannot determine whether Correctional Officers Key and Stith's actions were entirely appropriate in light of the circumstances or rise to the level of deliberate indifference.  Although the Court must "'draw all reasonable inferences in favor of the plaintiff,'" *Kensington*, 684 F.3d at 467 (quoting *Kolon Indus., Inc.*, 637 F.3d at 440), the Court cannot infer facts that are not alleged in the Complaint.

Because Sams does not allege facts showing that Correctional Officers Key and Stith "recognized that [their] actions were 'inappropriate in light of th[e] risk'" facing Sams, *Cleveland*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2), the Court determines that Sams has not stated a claim for deliberate indifference against them.  The Court will grant the PRJA

Individual Defendants Motion to Dismiss as to the deliberate indifference claims against Correctional Officers Key and Stith.

## VI.  Count II:  Gross Negligence

The Court determines that Sams has stated a claim for gross negligence against Defendants Harris, Kelske, Armor, Robinson, Turner, and PRJA, but not against Defendants Cumbo, Murrell, Key, and Stith.

### A.       Legal Standard:  Gross Negligence

Virginia recognizes three degrees of negligence:  (1) simple or ordinary negligence; (2) gross negligence; and, (3) willful or wanton negligence.  *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004).[21]  To prove gross negligence under Virginia law, the plaintiff must show the basic elements of negligence:  "a legal duty, a violation of the duty, and a consequent injury."  *Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988). "The finding of a legal duty is a prerequisite to a finding of negligence."  *Quisenberry v.*

---

[21] As the Virginia Supreme Court has explained,

[t]he first level, simple negligence, involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another.  The second level, gross negligence, is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.  This requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness.

The third level of negligent conduct is willful and wanton negligence.  This conduct is defined as acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.

*Cowan*, 603 S.E.2d at 918–19 (internal quotations and citations omitted).

*Huntington Ingalls, Inc.*, 818 S.E.2d 805, 809 (Va. 2018) (internal citations omitted).  "Without a legal duty there can be no cause of action for an injury."  *Id.*

Should a duty exist, Virginia law defines gross negligence as "the utter disregard of prudence amounting to complete neglect of the safety of another.  It is a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care."  *Volpe*, 708 S.E.2d at 828 (internal citations and quotations omitted).  "Because the standard for gross negligence [in Virginia] is one of indifference, not inadequacy, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care."  *Fijalkowski v. Wheeler*, 361 F. Supp. 3d 577, 593 (E.D. Va. 2019) (internal citations and quotations omitted).

"Several acts of negligence which separately may not amount to gross negligence, when combined may have a cumulative effect showing a form of reckless or total disregard for another's safety."  *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (internal quotations and citation omitted).  "Ordinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury."  *Id.*

Virginia courts have found that "a claim for gross negligence under Virginia law requires a lesser showing of recklessness than a claim for deliberate indifference under the Eighth and Fourteenth Amendments."  *Hixson v. Hutcheson*, No. 5:17cv00032, 2018 WL 814059, at *6 (W.D. Va. Feb. 9, 2018) (citing *Reid v. Newton*, No. 3:13cv572, 2014 WL 1493569, at *8 n.11 (E.D. Va. Apr. 14, 2014).  Because "the facts required to prove gross negligence are substantially similar to those required to prove deliberate indifference . . . the Virginia Supreme Court has 'applied the doctrine of collateral estoppel to any prior determination of either.'"  *Id.* (quoting *Chaplin v. Maas*, No. 5:12cv30028, 2013 WL 1249173, at *9 (citing *Whitley v. Commonwealth*,

538 S.E.2d 296 (2000)), *report and recommendation adopted*, No. 5:12cv30028, 2013 WL 1249146 (W.D. Va. Mar. 26, 2013).

Because of these well-settled similarities and the lower standard for showing gross negligence, at the motion to dismiss stage, the Court finds that if Sams has stated a claim for deliberate indifference under the Eighth and Fourteenth Amendments, she has also stated a claim for gross negligence under Virginia law. *See Hixson*, 2018 WL 814059, at *6 ("[T]he court will assume that if [the plaintiff] has pled a cognizable deliberate indifference claim, he has also pled a cognizable gross negligence claim.")

**B.     The Armor Defendants[22]**

The Court determines that Sams has stated a claim for gross negligence against Harris, Kelske and Armor, but not Cumbo and Murrell.  Because the Court has already determined that Sams has stated a claim for deliberate indifference against ARNP Harris and EMT Kelske, the Court concludes that she has similarly stated a claim for gross negligence against those two defendants. *Hixson*, 2018 WL 814059, at *6.  The Court therefore proceeds to address the gross negligence claims against Defendants Cumbo, Murrell, and Armor.

**1.     Nurse Cumbo**

The Court determines that Sams has not stated a claim for gross negligence against Cumbo.  A claim for gross negligence must fail as a matter of law where the facts "show[] that the defendant[] exercised some degree of care." *Fijalkowski*, 361 F. Supp. 3d at 593; *see also*

---

[22] In the Motions to Dismiss, the Defendants do not challenge whether they had a legal duty to Sams or whether the alleged violation of that duty led to Sams's injuries.  *See Chesapeake*, 365 S.E.2d at 754 (stating that a finding of negligence under Virginia law requires "a legal duty, a violation of the duty, and a consequent injury.")  Rather, Defendants contest that the alleged violation of their legal duty was so "heedless and palpable" that it amounted to "the absence of slight diligence, or the want of even scant care." *Volpe*, 708 S.E.2d at 828 (internal citations and quotations omitted).

*Elliott*, 791 S.E.2d at 732.  Here, the facts show that Nurse Cumbo exercised some care when she conveyed information about Sams's condition to Nurse Practitioner Harris.

On September 12, 2018, Nurse Cumbo saw Sams and recorded Sams's symptoms writing that "'[i]nformation [was] given'" to Nurse Practioner Harris.  (Compl. ¶ 34.)  As stated above in dismissing the deliberate indifference claim against Nurse Cumbo, Sams asserts that [licensed practical nurses] such as Cumbo are "not permitted in Virginia to independently assess patients or render a nursing diagnosis or nursing opinion . . . and must always act under the supervision and direction of a registered nurse.  (Compl. 13 n.3.)  Therefore, because Cumbo was not permitted to treat Sams without Nurse Practitioner Harris or another supervisory medical professional present, her decision to pass information about Sams's condition to a supervising professional does not show "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Volpe*, 708 S.E.2d at 828 (internal citations and quotations omitted).  Indeed, it shows "some degree of care" on the part of Cumbo sufficient to preclude a claim of gross negligence. *Fijalkowski*, 361 F. Supp. 3d at 593.

Because, drawing all inferences in favor of Sams, Nurse Cumbo was not permitted to treat or diagnose Sams without Nurse Practitioner Harris or another supervisory medical professional present, conveying "information" about Sams to Harris shows "some degree of care." *Fijalkowski*, 361 F. Supp. 3d at 593.  Accordingly, the Court will dismiss the gross negligence claim as to LPN Cumbo.

### 2.    <u>Nurse Murrell</u>

The Court determines that Sams has not stated a gross negligence claim against Nurse Murrell, either.  As with Sams's claim of deliberate indifference against Murrell, Sams alleges

64

that Murrell was grossly negligent in failing to "notify a doctor or nurse practitioner . . . or otherwise cause . . . Sams to be transported to a hospital" after dispensing Promethazine to Sams at 8:00 p.m. on September 14, 2018.  (Compl. ¶ 46.)

Gross negligence claims require a lower level of knowledge of potential danger or harm than a deliberate indifference claim.  "Unlike deliberate indifference, gross negligence does not require a finding that a defendant knew of a substantial risk . . . . [i]t is enough that the defendant should have been aware of that risk."  *Hixson*, 2018 WL 814059, at *6 (citing *Coppage v. Mann*, 906 F. Supp. 1025, 1049 (E.D. Va. 1995)).  Despite this lower level of requisite knowledge, the allegations in Sams's Complaint do not plausibly show that Nurse Murrell "should have been aware" of the risk facing Sams on the evening of September 14, 2018 at 8:00 p.m. when Murrell "dispensed Promethazine to . . . Sams."  (Compl. ¶ 46.)  Furthermore, the Complaint shows that Murrell exercised "some degree of care," *Fijalkowski*, 361 F. Supp. 3d at 593, in dispensing medication to Sams.

First, as stated above regarding the deliberate indifference claim against Murrell, the Complaint does not provide a substantial basis to infer that Murrell observed or should have observed Sams's abnormal behavior or became aware of Sams's complaints when she dispensed the medication to Sams.  Sams alleges that it is reasonable to infer that Murrell obtained or should have obtained such knowledge due to Sams's "documented condition preceding, at the time of, and/or following Murrell's encounter with [Sams]."  (Compl. ¶ 48.)  But this statement, rather than providing the basis for a reasonable inference, leaves open the distinct possibility that Sams's observable symptoms began "following" Murrell's interaction with her.  (*Id*.) Furthermore, while the medical records from Memorial Regional demonstrate that Sams required medical assistance on the night of September 14, 2018 when viewed as a *whole*, it is not a

reasonable inference that Murrell observed every piece of information later reflected in the

Memorial Regional records during her brief interaction with Sams.  Despite the lower standard

of knowledge for gross negligence claims vis-à-vis deliberate indifference claims, Sams's

unsupported statement that Nurse Murrell "learned of . . . Sams's abnormal and altered mental

status condition and other signs and complaints of severe medical distress," (*id*.), still more

closely resembles a "naked assertion[] of wrongdoing" than not.  *Francis*, 588 F.3d at 193.  Her

statement that Murrell knew or should have known of Sams's condition necessitates further

"factual enhancement . . . to cross the line between possibility and plausibility of entitlement to

relief."  *Francis*, 588 F.3d at 193.  The Complaint does not set forth facts showing that Murrell

"should have been aware of th[e] risk" facing Sams at that particular point in time.  *Hixson*, 2018

WL 814059, at *6 (citing *Coppage*, 906 F. Supp. at 1049).

      Second, even if Nurse Murrell became aware of some of Sams's complaints and altered

mental state, Murrell "dispensed Promethazine to . . . Sams," (Compl. ¶ 46), showing "some

degree of care."  *Fijalkowski*, 361 F. Supp. 3d at 593.  Sams does not allege that Murrell had

previously treated Sams or otherwise knew of her previous requests for medical assistance,

complaints, or visits to Medical.  Therefore, the act of distributing medication to Sams,

specifically medication prescribed by supervising Nurse Practitioner Harris meant to address

Sams's nausea, showed "some degree of care" on the part of Murrell.  *Id*.; *see Murray v. Correct

Care Sols., LLC*, No. 3:16cv00279, 2017 WL 214189, at *3 (E.D. Va. Jan. 18, 2017) (finding

physician had exercised "some degree of care when he ordered administration of oxygen and

monitoring" to a patient with low oxygen levels when he "did not know about any further serious

medical needs that he needed to address").

The Court concludes that Sams has not stated a claim for gross negligence against Murrell, and the Court will grant the Murrell Motion to Dismiss as to that claim.

**3.    <u>Armor</u>**

Sams has successfully stated a claim for gross negligence against Armor under the theory of *respondeat superior*.[23]

Under Virginia law, "a plaintiff claiming that an employer is liable under the doctrine of *respondeat superior* must allege that the tortious conduct occurred while the employee was performing his employer's business and acting within the scope of the employee's employment." *Heckenlaible*, 2006 WL 2252026, at *3 (citing *Butler v. S. States Coop. Inc*., 620 S.E.2d 768, 773 (Va. 2005)).  At the motion to dismiss stage, the plaintiff must state a "*prima facie* case" that the "employee acted within the scope of the[ir] employment when the act which caused the injury was committed . . . by establishing the employer-employee relationship at the time." *Id*. (quoting *Majorana v. Crown Cent. Petroleum Corp*., 539 S.E.2d 426, 428–29 (Va. 2000).

Sams has successfully established a *prima facie* "employer-employee relationship" between Armor, ARNP Harris, and EMT Kelske at the time "the act[s] which caused [Sams's] injury [were] committed." *Id*.  Sams states that Harris and Kelske were "[a]t all relevant times . . . . employee[s] and/or agent[s] of Armor acting within the scope of [their] employment and/or agency, and under color of state law."  (Compl. ¶¶ 18, 19.)  Harris and Kelske's conduct in relation to Sams fell within the duties outlined in their respective Armor job descriptions to "[m]anage[] patient's overall care" and "[p]rovide[] direct paramedical and comprehensive patient care."  (*Id*.)

---

[23] Armor disputes whether it can be held liable for a claim of gross negligence in the Armor Motion to Dismiss, arguing that none of its employees were grossly negligent.

Considering these allegations, Sams has stated a *prima facie* case that Armor, Harris, and Kelske were in a "employer-employee relationship at the time" of the "act[s] which caused the injury [were] committed."  *Heckenlaible*, 2006 WL 2252026, at *3 (quoting *Majorana*, 539 S.E.2d at 428–29).  Armor may be held responsible for Sams's claims of gross negligence against Harris and Kelske under a theory of *respondeat superior*.  The Court will therefore deny the Armor Motion to Dismiss as to the gross negligence claim against it.

C.      **The PRJA Defendants**

The Court determines that Sams has stated a claim for gross negligence against Correctional Officers Robinson, Turner, and the PRJA, but not against Correctional Officers Key and Stith.  Because the Court has already determined that Sams has stated a claim for deliberate indifference against Robinson and Turner, the Court concludes that she has also stated a claim for gross negligence against those two defendants.  *Hixson*, 2018 WL 814059, at *6.  The Court therefore proceeds to address the gross negligence claims against Key, Stith, and PRJA.

1.      **Correctional Officers Key & Stith**

Sams has not stated a claim for gross negligence against Correctional Officers Key and Stith because she has failed to plead facts showing that Key and Stith were completely indifferent to her medical needs.  For a claim of gross negligence to lie against Officers Key and Stith, Sams must show that their actions reflected an "utter disregard of prudence amounting to complete neglect of the safety of [Sams]."  *Volpe*, 708 S.E.2d at 828 (internal citations and quotations omitted).

Here, Sams has not alleged facts showing that Correctional Officers Key and Stith's actions rose to the level of "complete neglect" for the safety of Sams.  *Id.* (internal citations and quotations omitted).  Sams alleges that Key and Stith were assigned to H Unit on the morning of

68

September 15, 2018, but "long failed to provide . . . Sams with access to medical care, failing to call Medical until about 8:43 a.m."  (Compl. ¶ 48.)  Yet, as stated above in dismissing the claims for deliberate indifference against Correctional Officers Key and Stith, the Complaint contains no factual allegations about when Key and Stith's shift began on the morning of September 15, 2018 or when they became aware of Sams's condition.  Without any such allegations, the Court cannot determine whether Key and Stith's decision to call for medical assistance at 8:43 a.m. was completely warranted by the time when they learned of Sams's condition or constituted an "utter disregard of prudence amounting to complete neglect of the safety of [Sams]."  *Volpe*, 708 S.E.2d at 828 (internal citations and quotations omitted).  While the Court must "'draw all reasonable inferences in favor of the plaintiff,'" *Kensington*, 684 F.3d at 467 (quoting *Kolon Indus., Inc.*, 637 F.3d at 440), the Court cannot infer facts that are not alleged in the Complaint.

Furthermore, the Complaint demonstrates that Key and Stith "exercised some degree of care" for Sams by calling for aide.  *Fijalkowski*, 361 F. Supp. 3d at 593 (finding no gross negligence where plaintiff claimed police officers were "grossly negligent not because they did nothing to rescue plaintiff, but because they waited too long to rescue plaintiff"); *see also Henderson v. Huling*, No. 4:16cv166, 2017 WL 4209761, at *5 (E.D. Va. Sept. 20, 2017) ("[A]ny claims for gross negligence . . .  fail because . . . Officers called an ambulance to treat Plaintiff.")  The Court recognizes that a substantial and unwarranted delay in providing medical care may constitute a degree of indifference substantial enough to show gross negligence.  However, because Correctional Officers Key and Stith provided some care to Sams and because the factual allegations in the Complaint do not allow the Court to assess any alleged delay in providing that care, any inference that Key and Stith would be liable for gross negligence is not plausible.  *See Twombly*, 550 U.S. at 556.

Because Sams has not shown that Correctional Officers Key and Stith delayed in obtaining medical care, and because the Complaint demonstrates that they "exercised some degree of care" for Sams by calling Medical, *Fijalkowski*, 361 F. Supp. 3d at 593, the Court determines that Sams has not stated a claim for deliberate indifference against Correctional Officers Key and Stith.  The Court will therefore grant the PRJA Individual Defendants Motion to Dismiss as to the gross negligence claim against them.

### 2. **PRJA**

Sams has successfully stated a claim for gross negligence against PRJA under the theory of *respondeat superior*.  As stated above, to state a *prima facie* case of liability under the doctrine of *respondeat superior*, a plaintiff must allege that the "employee acted within the scope of the[ir] employment when the act which caused the injury was committed . . . by establishing the employer-employee relationship at the time."  *Heckenlaible*, 2006 WL 2252026, at *3 (quoting *Majorana*, 539 S.E.2d at 428–29).

Here, Sams alleges that Officers Robinson and Turner were "[a]t all relevant times hereto . . . acting within the course and scope of their employment and/or agency with the Regional Jail Authority, and under color of state law."  (Compl. ¶ 23.)  On the night of September 14, 2018, Robinson and Turner were on a "night shift" at the jail.  (*Id.*)  Their conduct and omissions, which Sams alleges led to her injury, fall within the scope of their job descriptions to "[c]ontrol and monitor housing areas . . . monitor inmate behavior and activity . . . . [and] [r]espond to emergency situations or codes in order to establish control and safety of co-workers and inmates."  (*Id.* ¶ 25.)

Considering these allegations, Sams has stated a *prima facie* case that PRJA, Robinson, and Turner were in a "employer-employee relationship at the time" of the "act[s] which caused

the injury." *Heckenlaible*, 2006 WL 2252026, at *3 (quoting *Majorana*, 539 S.E.2d at 428–29). Armor may be held responsible for Sams's claims of gross negligence against Robinson and Turner under a theory of *respondeat superior*.  The Court will therefore deny the Armor Motion to Dismiss the gross negligence claims against it.

## VII.  Conclusion

For the foregoing reasons, the Court will grant the Murrell Motion to Dismiss, (ECF No. 41), grant in part and deny in part the Armor Individual Defendants Motion to Dismiss and the PRJA Individual Defendants Motion to Dismiss (ECF Nos. 15, 22), and deny the Armor Motion to Dismiss, the PRJA Motion to Dismiss, and the PRJA Motion to Certify, (ECF Nos. 11, 20, 29.)

An appropriate order shall issue.

/s/

M. Hannah Lauck
United States District Judge

M. Hannah Lauck
United States District Judge

Date: September 30, 2020
Richmond, Virginia